# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 55267-1-II |
| Respondent, | |
| v. | PART PUBLISHED OPINION |
| NAVIN AVERY MILKO, | |
| Appellant. | |

MAXA, P.J. – Navin Milko appeals his multiple convictions arising from five incidents in which he accosted paid escorts he had arranged to meet. Specifically, he challenges on confrontation clause grounds the trial court's ruling allowing two out-of-state witnesses to testify by video because of COVID-19 concerns. In a statement of additional grounds (SAG), Milko challenges his convictions and his exceptional sentence.

A criminal defendant's right to have witnesses physically present at trial is meaningful and important. But it is not an indispensable element of the constitutional right of confrontation, and may be overridden when (1) "excusing the physical presence of the particular witness is necessary to further an important public policy" and (2) "the reliability of the testimony is otherwise assured." *State v. Foster*, 135 Wn.2d 441, 466, 957 P.2d 712 (1998). The trial court entered findings supporting both prongs of this test with regard to the two witnesses.

We hold that the trial court did not err when it allowed the two out-of-state witnesses to testify by video based on necessity for public policy reasons because they both had significant

health-related concerns about contracting COVID-19 if forced to travel to Washington by air. In the unpublished portion of this opinion, we reject Milko's SAG claims. Accordingly, we affirm Milko's convictions and sentence.

FACTS

*Background*

In 2018, Milko on five separate occasions contacted women who worked as paid escorts and arranged to meet them at houses in Puyallup that he did not live in or own. When each woman arrived, Milko displayed a knife in an attempt to take their money or to rape them.

Milko raped one woman, BP. BP was examined at the hospital by Jenny Biddulph, a sexual assault nurse examiner, who completed a rape kit. A forensic scientist later confirmed that the samples from the rape kit matched Milko's DNA. The police eventually detained Milko, who admitted during a police interview that he had sex with BP.

The State charged Milko with 12 felony offenses related to the five incidents and five victims: one count of first degree rape of BP, two counts of second degree burglary of BP and a woman named AQ, two counts of attempted first degree rape of AQ and a woman named CD, one count of first degree burglary of a woman named AB, two counts of attempted first degree kidnapping of AB and a woman named KT, two counts of attempted first degree robbery of AB and CD, one count of attempted first degree burglary of KT, and one count of felony harassment of AB. The State also alleged three aggravating factors.

In 2009 and 2010, Milko had engaged in two similar incidents in Florida involving paid escorts. There, Milko had contacted a woman named JA and another woman on separate occasions and asked them to meet him at a house that he did not live in or own. Milko raped both women at knifepoint. Milko pled guilty to charges related to both incidents.

No. 55267-1-II

*Request to Allow Video Testimony*

Milko's trial was set for July 2020, after COVID-19 had been declared a global pandemic and a national emergency in the United States. In February 2020, Governor Jay Inslee had proclaimed a state of emergency in Washington. He issued a number of proclamations designed to help curb the spread of COVID-19. The Supreme Court ordered all courts to follow the most protective public health guidance applicable in their jurisdiction and to use remote proceedings for public health and safety whenever appropriate.

During this state of emergency, the Center for Disease Control and Prevention (CDC) and the Washington Department of Health recommended social distancing measures of at least six feet between people and encouraged vulnerable individuals to avoid public spaces. The CDC encouraged people to avoid traveling because travel increased a person's chance of getting infected and spreading COVID-19. The CDC noted that older adults and people of any age with serious underlying medical conditions, such as diabetes and asthma, were at a higher risk for severe illness from COVID-19.

Before trial, Biddulph and JA informed the State that they were not able to fly to Washington to give their trial testimony in person because of significant health concerns related to COVID-19. Biddulph had moved to Virginia since examining BP and JA now lived in North Carolina. The State requested that the trial court allow Biddulph and JA to testify remotely by two-way video. In its request for video testimony, the State included several exhibits related to the pandemic, declarations from Biddulph and JA, and a letter from Biddulph's nurse practitioner. The court tentatively granted the motion, subject to an offer of proof as to why Biddulph and JA could not testify in person and a test run of the video and audio set-up.

The trial court held a hearing where it tested the video and audio equipment for remote testimony. Biddulph and JA both provided testimony about their concerns about flying to Washington, and the State and Milko questioned them about why they could not testify in person.

Biddulph stated in her declaration and at the hearing that she was concerned about flying because it would place her and her family at a significantly higher risk of exposure to COVID-19. Biddulph explained that she had three children and a husband who was attending school. She stated that she had stopped working as a nurse for her family's safety and to take care of her children, including a one-year-old baby who required specialized care due to feeding and weight gain issues. Biddulph's health care provider stated in a letter that it was not safe for Biddulph to travel because she had an infant at home.

Biddulph also stated that she and her husband had no local support system because their families lived abroad and that there would be no one available to take care of their children if either of them contracted COVID-19 or if she was to comply with the Virginia Department of Health's recommendation to self-quarantine for two weeks after returning home.

JA stated in her declaration and at the hearing that she was concerned about flying from South Carolina to Washington while wearing a mask because she had asthma, which made her a high-risk individual who was vulnerable to suffering severe health complications if she contracted COVID-19. She also explained that she could not wear a mask for a long period of time because wearing a mask constricted her breathing. She stated that her doctor had suggested that she avoid traveling or comingling around other people because of her status as a high-risk person. JA explained that she also had hypertension and diabetes, which were two additional medical conditions that made her a high-risk person.

The trial court granted the State's request to allow Biddulph and JA to testify remotely and entered detailed findings of fact and conclusions of law.

The court made the following finding regarding Biddulph:

15.  The court finds that Ms. Biddulph's testimony is necessary and that she cannot travel to Washington to testify because travel will place her at a significantly higher risk of exposure to the virus and that, in turn, will require her to quarantine, which she lacks the wherewithal to do while maintaining custody of her dependent children.  Live testimony by Ms. Biddulph will place her and her children at an unreasonable risk of family separation and financial hardship.

Clerk's Papers (CP) at 512.

The court made the following finding regarding JA:

18.  The court finds that J.A.'s testimony is necessary.  The court finds that J.A.'s health concerns are warranted given the current circumstances with COVID-19. The court also finds that J.A.'s health is currently compromised, and she is at a higher risk of serious medical complications should she contract COVID-19.  The court also finds that the witness cannot travel to Washington to testify because her health does not permit her to abide by airline mask requirements.

CP at 512.

The court entered the following conclusions of law:

1.  There is a compelling interest that has demonstrated that due to the COVID-19 pandemic, there is a need to maintain appropriate social distancing in the courtroom.

2.  This compelling interest has been recognized by the emergency proclamations made by Governor Jay Inslee and the Washington Supreme Court.
. . . .

4.  As a result, there is a compelling interest requiring the court to conduct trial in a manner that will protect the health and safety of the parties, jurors, counsel, court staff, witnesses, and the public.

5.  This compelling interest in health and safety in the midst of a global pandemic is an important public policy that requires the court to utilize remote testimony to ensure the safety of witnesses.

6.  The utilization of remote testimony necessarily furthers this important public policy of ensuring the health and safety of the parties, jurors, counsel, court staff, witnesses, and the public.

CP 514-15.

The court also entered the following findings of fact regarding the technology used to present the remote testimony:

> 22. Using an enhanced audio system in trial, the audio presentation of witnesses during trial was sufficient to allow the parties and the jurors to hear and understand what was being said by the witnesses, and it allowed the court reporter to make an adequate record of the language being used. The audio presentation allowed parties and the jurors to understand the words, emotions, speech patterns, and articulation of each witness.
> . . . .
>
> 26. The technology utilized during each witness' testimony provided the functional equivalent of the temporal and physical proximity of face-to-face testimony.

CP at 513-14. The court concluded that "[t]he utilization of technology to accomplish remote testimony provides clear evidence to the court that the reliability of the testimony [was] assured." CP at 515.[1]

*Jury Trial*

At trial, the five victims and several investigating officers testified in person about the incidents giving rise to the charges against Milko.

Biddulph testified by two-way video about examining BP and completing a rape kit for her. JA testified by two-way video about Milko contacting her for her paid escort services in Florida and raping her at knifepoint. The trial court instructed the jury that the State was offering JA's testimony only to establish identity, a common scheme or plan, and/or modus operandi.

The jury found Milko guilty of all charges except for attempted first degree robbery of AB and CD and found in special verdict forms the existence of certain aggravating factors.

---

[1] The trial court later entered amended findings of fact and conclusions of law that included the findings and conclusions quoted above.

Milko appeals his convictions and sentence.

ANALYSIS

Milko argues that the trial court violated his constitutional right to confront Biddulph and JA by allowing them to testify by video. We disagree.

A.    LEGAL PRINCIPLES

The confrontation clause of the Sixth Amendment to the United States Constitution provides that a person accused of a crime has the right "to be confronted with the witnesses against him." Article I, section 22 of the Washington Constitution states that an "accused shall have the right . . . to meet the witnesses against him face to face."

The United States Supreme Court in *Maryland v. Craig* addressed whether the Sixth Amendment prohibited a child witness in a child abuse case from testifying by one-way closed circuit television. 497 U.S. 836, 840, 110 S. Ct. 3157, 111 L. Ed. 2d 666 (1990). The Court acknowledged that having witnesses physically present at trial – face-to-face-confrontation – was one of the core elements of the confrontation clause. *Id.* at 846-47. However, the Court stated that face-to-face confrontation was only a "*preference*," and the preference " 'must occasionally give way to considerations of public policy and the necessities of the case.' " *Id.* at 849 (quoting *Mattox v. United States*, 156 U.S. 237, 243, 15 S. Ct. 337, 39 L. Ed. 409 (1895)).

As a result, the Court stated that "though we reaffirm the importance of face-to-face confrontation with witnesses appearing at trial, we cannot say that such confrontation is an indispensable element of the Sixth Amendment's guarantee of the right to confront one's accusers." *Craig*, 497 U.S. at 849-50. However, the Court emphasized that "a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy

and only where the reliability of the testimony is otherwise assured." *Id.* at 850. A procedure that does not require face-to-face presence of a witness does not violate the confrontation clause if it "ensures the reliability of the evidence by subjecting it to rigorous adversarial testing and thereby preserves the essence of effective confrontation." *Id.* at 857.

Our Supreme Court in *Foster* also addressed a child witness testifying through one-way closed circuit television and held that such a procedure did not violate the Washington Constitution. 135 Wn.2d at 444. The court discussed *Craig* at length, and concluded that in this context the right to confrontation under article I, section 22 of the Washington Constitution was identical to that right under the Sixth Amendment. *Id.* at 466.

The court in *Foster* agreed with the analysis and approach adopted in *Craig*:

> The confrontation clauses of the state and federal constitutions guarantee the right of an accused to confront witnesses against him or her "face to face." This is a preferred right of physical presence, or "face-to-face" confrontation, which may be dispensed with only if (1) excusing the physical presence of the particular witness is necessary to further an important public policy and (2) the reliability of the testimony is otherwise assured.

*Id.*

In *State v. Sweidan*, Division Three of this court applied the *Craig* test in a case in which the trial court allowed an out-of-state witness to testify by videoconference because she was the sole care provider for her mother, who had cancer and who recently had undergone open heart surgery. 13 Wn. App. 2d 53, 58-59, 64, 461 P.3d 378 (2020). The court held that caring for an ailing family member was an important state interest supporting remote testimony, but the State had not shown and the trial court had made no finding that it was necessary for the witness to testify remotely. *Id.* at 71-73. However, the court concluded that allowing the remote testimony was harmless. *Id.* at 56.

Both *Craig* and *Foster* involved one-way closed-circuit television testimony of a child witness. However, the *Craig* two-prong test also logically applies to two-way video testimony. *See Sweidan*, 13 Wn. App. 2d at 66; *see also Craig*, 497 U.S. at 854 (noting that several states "authorize the use of a two-way system in which the child witness is permitted to see the courtroom and the defendant on a video monitor and in which the jury and judge are permitted to view the child during the testimony").

B.      STANDARD OF REVIEW

Both *Craig* and *Foster* involved the constitutionality of statutes allowing a child witness to testify by closed-circuit television and the application of the statutory language, so those cases do not inform the standard of review here. The court in *Sweidan* declined to resolve this issue, in part because its decision was the same regardless of the standard of review. 13 Wn. App. 2d at 60-61.

In general, we review de novo alleged violations of the confrontation clause. *State v. Burke*, 196 Wn.2d 712, 725, 478 P.3d 1096, *cert. denied,* 142 S. Ct. 182 (2021). However, we conclude that the question of necessity – the only portion of the *Craig* test at issue here – is a mixed question of law and fact. Under a mixed standard of review, we review the trial court's factual findings relating to necessity for substantial evidence and review de novo the trial court's legal conclusion that video testimony is necessary. *See State v. Davila*, 184 Wn.2d 55, 75, 357 P.3d 636 (2015) (standard of review for *Brady* claims).

C.      NECESSITY OF VIDEO TESTIMONY

Milko concedes that there was a valid public policy of preventing the spread of COVID-19. And he does not address the second prong of the *Craig* analysis, the reliability of the

testimony. Milko challenges only the trial court's conclusion that the use of video testimony was *necessary* to further COVID-19 public policy.

1. Necessity of Case-Specific Analysis

In *Craig*, the Court stated that the finding of necessity must be case specific. 497 U.S. at 855. In the context of a child witness in a sex abuse case, the findings must include:

> (1) a finding by the trial court that the use of the closed-circuit television procedure is necessary to protect the welfare of the particular child witness who seeks to testify; (2) a finding by the trial court that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant; and (3) a finding by the trial court that the emotional distress suffered by the child witness in the presence of the defendant is more than de minimus.

*Foster*, 135 Wn.2d at 467 (citing *Craig*, 497 U.S. at 855-56). The essence of the first and third factors are applicable here. Video testimony must be necessary to protect the witness's health because of the COVID-19 pandemic, and the risk to the witness's health must be more than de minimis.

In *Sweidan*, the court declined to adopt a specific definition of necessity for purposes of that appeal. 13 Wn. App. 2d at 73. But the court concluded that "necessary" in the context of allowing remote testimony means more than merely convenient but less than an absolute physical necessity. *Id.* at 72-73. We agree with those parameters.

We emphasize that even though the *Craig* test allows the use of video testimony in some circumstances, there remains a strong preference for face-to-face confrontation of witnesses. "That the face-to-face confrontation requirement is not absolute does not, of course, mean that it may easily be dispensed with." *Craig*, 497 U.S. at 850. Video testimony should be allowed only for compelling reasons. Therefore, the trial court must thoroughly consider the proffered reasons why a witness cannot appear in person and conduct an evidentiary hearing if appropriate. And

the court must critically analyze those reasons to determine if they actually are necessary to further an important public interest.

2. Analysis

The trial court here thoroughly addressed this issue, heard evidence, and entered detailed findings supporting its decision to allow video testimony.

Milko does not challenge the trial court's factual findings regarding Biddulph, and substantial evidence supports those findings. The trial court found that Biddulph's concerns that traveling to Washington would place her and her children at risk of negative health consequences regarding COVID-19 were warranted. Biddulph in particular had health concerns about her one-year-old daughter, who had compromised health. And the court made a finding that Biddulph's health care provider "advised against travel in order to protect the health of Ms. Biddulph and her small child." CP at 511. The court's ultimate finding was that Biddulph "cannot travel to Washington to testify because travel will place her at a significantly higher risk of exposure to the virus." CP at 512.

We conclude that these findings support the conclusion that video testimony was necessary to protect the health of Biddulph and her health compromised child. Accommodating Biddulph's health concerns was more than a matter of convenience. In addition, concern for the health of a third person may be sufficient to support a finding of necessity. See *Sweidan*, 13 Wn. App. 2d at 71. This is especially true in a pandemic. Given the nature of the COVID-19 pandemic, the risk to the health of Biddulph and her child if Biddulph was required to travel to Washington was significant and more than de minimis.[2]

---

[2] Because of this holding, we do not address whether the trial court's findings that travel would cause family separation and financial hardship because Biddulph would have had to quarantine, supported the conclusion that video testimony was necessary.

Milko does not challenge the trial court's factual findings regarding JA, and substantial evidence supports those findings. The trial court found that JA's health concerns due to her diabetes and asthma were warranted. The court also found that these conditions would "place her at a higher risk of suffering severe health consequences if she were to contract COVID-19." CP at 512. Further, the court found that JA's conditions "make it difficult, if not impossible, to wear a face mask for an extended period of time, including on a cross-country flight." CP at 512. The court's ultimate finding was that "J.A.'s health is currently compromised, and she is at a higher risk of serious medical complications should she contract COVID-19." CP at 512.

We conclude that these findings support the conclusion that video testimony was necessary to protect JA's health. Accommodating JA's health conditions was more than a matter of convenience. Given the nature of the COVID-19 pandemic, the risk to JA's health if she was required to travel to Washington was significant and more than de minimis.

Cases from other jurisdictions support the conclusions regarding the necessity of Biddulph's and JA's video testimony. In *Horn v. Quarterman*, an out-of-state prosecution witness was hospitalized with liver cancer and was not expected to improve. 508 F.3d 306, 313 (5th Cir. 2007). His doctor stated that it would be medically unsafe for him to travel. *Id.* The state trial court allowed the witness to testify through two-way, closed circuit television. *Id.* The Fifth Circuit stated, "[I]t is possible to view *Craig* as allowing a necessity-based exception for face-to-face, in-courtroom confrontation where the witness's inability to testify invokes the state's interest in protecting the witness . . . from physical danger or suffering." *Id.* at 320. Therefore, the court concluded that the state court's ruling that television testimony did not violate the constitution "was not an unreasonable application of clearly established federal law." *Id.*

In *Bush v. State*, the Wyoming Supreme Court addressed a situation in which an out-of-state prosecution witness had suffered congestive heart failure a week before trial, was in profoundly poor condition, and was unable to travel to Wyoming. 2008 WY 108, ¶¶ 44, 46, 193 P.3d 203, 214. The trial court allowed the witness to testify by video conference. *Id.* ¶ 47. The Supreme Court reviewed the decision under the *Craig* test, and concluded that video testimony "was necessary to further the important public policy of preventing further harm to his already serious medical condition." *Id.* ¶ 53. Therefore, the video testimony did not violate the defendant's confrontation right. *Id.*

In *State v. Seelig*, the trial court found that an out-of-state witness who had a history of panic attacks had suffered a severe panic attack on the day he was scheduled to fly from his home to North Carolina for trial, was hospitalized as a result, and was unable to travel because of his medical condition. 226 N.C. App. 147, 158, 738 S.E.2d 427 (2013). The trial court allowed the witness to testify by "live closed-circuit web broadcast." *Id.* at 153. The North Carolina Court of Appeals concluded that "the trial court's findings were sufficient to establish that allowing [the witness] to testify by way of live two-way video was necessary to meet an important state interest." *Id.* at 158.

Milko argues that necessity can be found only when a witness has an actual health condition that prevents them from travelling, and that it was speculative whether either Biddulph or JA would actually contract COVID-19 if they travelled to Washington for trial. We disagree. In the midst of the pre-vaccine COVID-19 pandemic, a significant risk of contracting a virus that had killed hundreds of thousands of people was sufficient to establish necessity. And it is important to recognize that in July 2020, there still was significant uncertainty as to whether air travel was safe. The rapid evolution of the scientific knowledge about this pandemic further

underscores why trial courts must critically analyze on a case by case basis the issue of necessity for remote testimony.[3]

We hold that the trial court did not err in allowing Biddulph and JA to testify remotely by video and their testimony did not violate Milko's confrontation right.

CONCLUSION

We affirm Milko's convictions and sentence.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

In his SAG, Milko challenges the sufficiency of the evidence for his conviction of first degree attempted rape of one victim and his exceptional sentence. We reject these claims.

A.    SUFFICIENCY OF THE EVIDENCE

Milko asserts that the State failed to provide sufficient evidence to prove all elements of first degree attempted rape with respect to AQ. We disagree.

1.    Additional Facts

AQ testified that Milko contacted her for her escort services and told her to meet him at a house in Puyallup. When she arrived, Milko walked behind her and tried to get AQ to go through a fence in the backyard. However, she refused and he pushed her against the fence with a knife in his hand. She stated that she screamed repeatedly and that Milko proceeded to punch her in the face before running away. After she reported the incident to the police, an officer asked AQ to pick out her attacker from a photomontage. AQ stated that she could not remember

---

[3] In any event, for JA the trial court did make an unchallenged finding that JA did have a health condition – asthma – that prevented her from wearing a mask in an airplane as required by law.

exactly what her attacker looked like at the time and picked out someone other than Milko. She told the officer that the person she picked looked like someone she had seen on a television show. At trial, AQ identified Milko as her attacker.

BP testified that Milko contacted her for her escort services and told her to meet him at a house in Puyallup. The address was the same address that Milko gave to AQ. BP testified that Milko was walking behind her while she walked towards the backyard through a gate. She stated that after she walked through the gate, Milko had a knife out and proceeded to put it against her throat as he began raping her.

2.  Legal Principles

The test for determining sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt. *State v. Cardenas-Flores*, 189 Wn.2d 243, 265, 401 P.3d 19 (2017). In a sufficiency of the evidence claim, the defendant admits the truth of the evidence and the court views the evidence and all reasonable inferences drawn from that evidence in the light most favorable to the State. *Id.* at 265-66. Credibility determinations are made by the trier of fact and are not subject to review. *Id.* at 266. Circumstantial evidence is as equally reliable as direct evidence. *State v. Farnsworth*, 185 Wn.2d 768, 775, 374 P.3d 1152 (2016).

RCW 9A.44.040(1)(a) provides that a person is guilty of first degree rape "when such person engages in sexual intercourse with another person by forcible compulsion where the perpetrator . . . [u]ses or threatens to use a deadly weapon or what appears to be a deadly weapon." RCW 9A.28.020(1) provides that "[a] person is guilty of an attempt to commit a crime if, with intent to commit a specific crime, he or she does any act which is a substantial step toward the commission of that crime."

15

3.    Analysis

Milko relies on the fact that AQ conceded that he never said that he wanted to rape her and that he never grabbed at her clothes or her private parts. However, just like BP, AQ testified that Milko contacted her for her escort services. The address that Milko gave her was the same address that he gave BP. AQ testified that when she arrived, Milko stood behind her and tried to get her to go through a fence located in the backyard. Milko then pushed her from behind against the fence while drawing a knife out. BP similarly testified that Milko was walking behind her when he took her to the backyard through a gate, that he had a knife when she turned around, and that he then raped her. A jury reasonably could conclude that Milko made a substantial step toward raping AQ at knifepoint based on the similarity between Milko's behavior with AQ and with BP.

Milko also emphasizes that AQ picked the wrong person in the photomontage. However, she testified at trial that the person who attacked her was the same person in the courtroom – Milko. We do not reweigh testimony on appeal. *Cardenas-Flores*, 189 Wn.2d at 266.

Accordingly, we hold that sufficient evidence supports Milko's conviction of attempted first degree rape of AQ.

B.    EXCEPTIONAL SENTENCE

Milko asserts either that the trial court failed to explicitly state that his exceptional sentence was indeterminate rather than determinate, or that the trial court could not impose an indeterminate exceptional sentence. We disagree.

1.    Additional Facts

At sentencing, the State recommended that the trial court impose an indeterminate exceptional sentence of 602 months to life in prison. Defense counsel acknowledged that first

degree rape warranted an indeterminate sentence. The trial court adopted the State's

recommendation of an exceptional sentence based on the aggravators that the jury found and

entered detailed findings of fact and conclusions of law. Relevant here, the court stated in its

findings of fact that first degree rape and attempted first degree rape required an indeterminate

sentence.

>    2.    Legal Principles

RCW 9.94A.507(3)(a) provides that trial courts "shall impose a sentence to a maximum

term and a minimum term" for criminal defendants who are convicted of certain sex offenses.

Relevant here, these sex offenses include first degree rape and attempted first degree rape. RCW

9.94A.507(1)(a)(i), (iii). When a defendant has been sentenced under RCW 9.94A.507, the

Indeterminate Sentence Review Board will hold a hearing to determine the defendant's

likelihood to reoffend and whether he or she should be released into community custody for the

remaining time left under the maximum term. RCW 9.95.420(3)(a); *In re Post Sentence Review*

*of Hudgens*, 156 Wn. App. 411, 421-22, 233 P.3d 566 (2010).

RCW 9.94A.507(3)(c)(i) states that "the minimum term shall be either within the

standard sentence range for the offense, or outside the standard sentence range pursuant to RCW

9.94A.535, if the offender is otherwise eligible for such a sentence." A trial court may impose a

sentence that deviates from the standard sentencing range "if it finds, considering the purpose of

this chapter, that there are substantial and compelling reasons justifying an exceptional sentence"

RCW 9.94A.535[4]. When imposing an exceptional sentence, the trial court must set forth the

---

[4] RCW 9.94A.535 has been amended since the events of this case transpired. Because these amendments are not material to this case, we do not include the word "former" before RCW 9.94A.535.

reasons for its decision in written findings of fact and conclusions of law. RCW 9.94A.535; *see also State v. Friedlund*, 182 Wn.2d 388, 393, 341 P.3d 280 (2015).

    3.    Analysis

First, RCW 9.94A.507 and RCW 9.94A.535 do not require trial courts to make a written finding that an exceptional sentence is an indeterminate sentence. Regardless, the trial court here stated in its written findings of fact that first degree rape and attempted first degree rape required "an indeterminate sentence pursuant to RCW 9.94A.507." CP at 568-69. And both the State and defense counsel acknowledged at sentencing that Milko was subject to an indeterminate sentence.

Second, the plain language of RCW 9.94A.507(3)(c)(i) clearly allows trial courts to impose exceptional indeterminate sentences pursuant to RCW 9.94A.535. And Milko does not challenge any of the trial court's written findings of fact and conclusions of law or the jury finding the existence of several aggravating factors.

Accordingly, we reject Milko's claim regarding his exceptional sentence.

CONCLUSION

We affirm Milko's convictions and sentence.

_MAXA, J._
_____
MAXA, P.J.

We concur:

_PRICE, J._
_____
PRICE, J.

_BASSETT, J.P.T._
_____
BASSETT, J.P.T.*

* Judge Jeffrey Bassett is serving as a judge pro tempore of the court pursuant to RCW 2.06.150(1).