MODIFIED OPINION[1]

IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 124,601

STATE OF KANSAS,
*Appellee*,

v.

KIMBERLEY S. YOUNGER,
*Appellant*.

SYLLABUS BY THE COURT

1.

A violation of the Sixth Amendment Confrontation Clause is subject to harmless error analysis.

2.

The opportunity to conduct cross-examination is essential to a fair trial and helps assure the accuracy of the truth-determination process.

3.

In order to meet constitutional requirements, judges must make individualized determinations that an exception to the right to face-to-face confrontation is necessary to fulfill other important policy needs.

_____

[1]**REPORTER'S NOTE**:  No. 124,601 was modified by the Kansas Supreme Court on February 21, 2025, in response to appellant's motion for rehearing or modification. See new language at slip op. at 45-47.

1

4.

To be admissible as evidence, statements by a defendant who is in custody and subject to interrogation must be voluntary and, in general, made with an understanding of the defendant's constitutional rights.

5.

Statements made during a custodial interrogation must be excluded under the Fifth Amendment to the United States Constitution unless the State demonstrates it provided procedural safeguards, including *Miranda* warnings, to secure the defendant's privilege against self-incrimination.

6.

Procedural safeguards concerning self-incrimination are triggered when an accused is in custody and subject to interrogation.

7.

A suspect may invoke the right to counsel at any time by making, at a minimum, some statement that could be reasonably construed as an expression of a desire for the assistance of an attorney during a custodial interrogation.

8.

Once a suspect has invoked the right to counsel, there may be no further questioning unless the suspect both initiates further discussions with the police and knowingly and intelligently waives the previously asserted right.

9.

The procedural safeguards of *Miranda* are not required when a suspect is simply taken into custody; they only begin to operate when a suspect in custody is subjected to interrogation.

2

10.

When law enforcement officers say nothing to prompt spontaneous statements from a suspect, there is no basis for finding even subtle compulsion.

11.

Statements that are freely and voluntarily given without compelling influences are admissible in evidence.

12.

Reminding an accused person that an attorney might intervene to stop them from speaking with investigators is not proof of coercion and does not constitute an impermissible extension of the interview.

13.

Once an accused person has expressed a desire to deal with police only through counsel, they may not be subject to further interrogation by the authorities until counsel has been made available, unless the accused person initiates further communication, exchanges, or conversations with the police.

14.

Even after requesting counsel, an accused may change his or her mind and talk to police without counsel, if the accused initiates the change without interrogation or pressure from the police.

15.

The fact that a defendant is in custody and does not know his or her conversations are being recorded does not render the conversations involuntary or the products of custodial interrogations.

**16.**

For a consent to search to be valid, two conditions must be met: (1) there must be clear and positive testimony that consent was unequivocal, specific, and freely given; and (2) the consent must have been given without duress or coercion, express or implied.

**17.**

A trial court's decision whether to sequester a witness lies within that court's discretion. Furthermore, the trial court has discretion to permit certain witnesses to remain in the courtroom even if a sequestration order is in place.

**18.**

The appropriate amount for restitution is that which compensates a victim for the actual damage or loss caused by the defendant's crime.

**19.**

The State has the burden of justifying the amount of restitution it seeks.

Appeal from Barton District Court; JAMES R. FLEETWOOD, judge. Oral argument held September 11, 2023. Original opinion filed October 4, 2024. Modified opinion filed February 21, 2025. Affirmed in part, reversed in part, and remanded with directions.

*Clayton J. Perkins*, of Capital Appellate Defender Office, argued the cause, and *Caroline M. Zuschek* and *Kathryn D. Stevenson*, of the same office, were with him on the briefs for appellant.

*Kristafer R. Ailslieger,* deputy solicitor general, argued the cause, and *Kris Kobach*, attorney general, was with him on the briefs for appellee.

*Sharon Brett*, of ACLU Foundation of Kansas, was on the brief for amicus curiae American Civil Liberties Union of Kansas.

4

The opinion of the court was delivered by

ROSEN, J.: A jury convicted Kimberly S. Younger of one count of capital murder, one count of conspiracy to commit first-degree murder, one count of solicitation to commit first-degree murder, and one count of theft. Although she did not personally kill anyone, her coconspirators all testified that she was the principal organizer and planner of the two murders. She appeals, primarily challenging evidentiary rulings.

It is undisputed that two men killed two victims; those men confessed and pleaded guilty. Witness after witness placed the defendant in the present case not only at the scene of the crimes but as the person who orchestrated the crimes. The complained-of errors, while argued expansively and thoroughly, do not ultimately result in reversible prejudice to the defendant.

The facts in this case, as developed in the course of a nine-day jury trial, are complicated and, at times, read more like a fictional drama than a real-world criminal act.

FACTS AND PROCEDURAL BACKGROUND

Jason Wagner owned a carnival company that provided entertainment at fairs in the Midwest. In late July 2018, his company moved from a fair in Oklahoma and set up rides and concessions at the Barton County fair.

Frank Zaitshik owned a competing carnival company headquartered in Florida. Zaitshik is either a regular businessman whose company, like Wagner's, earns a profit by providing entertainment, or he is a sinister crime boss who has close ties to the Sicilian mafia and who masterminded a pair of murders at the Barton County fair. The former is the theory of the State and almost all the witnesses at the trial; the latter is the description provided by the defendant in this case and is the persona the defendant convinced others

5

to obey. Zaitshik spells his name with an "s"; on a Facebook page generated from Younger's phone, his name is spelled with a "c." In this opinion, the individual's name will be spelled "Zaitchik" when referring to the man the conspirators believed or pretended was a crime lord; the name will be spelled "Zaitshik" when referring to the actual carnival operator who testified at trial.

Alfred and Pauline Carpenter were an elderly couple from Wichita who traveled around the Midwest, setting up their camper and trailer at state fairs and selling inexpensive merchandise to fairgoers. They intended to close down and sell their business after the Barton County fair.

Kimberley Younger, the defendant and appellant in this case, is a woman in her fifties who worked for Wagner for several years as a truck driver and ticket seller. Younger was known to her employers and coworkers by several different names, none of them Kimberley Younger. She had a Florida driver's license under the name "Myrna Khan." She was known to her friends as "Jenna Roberts." And, at one point in the investigation, she identified herself as "Tiffany Jones." She purported to have connections with Frank Zaitshik, who, she maintained, operated a criminal enterprise through his carnival company.

Younger was romantically involved with, and possibly married to, Michael Fowler, another carnival employee. The two shared a unit in the carnival's mobile bunkhouse. Over time, Fowler became convinced that Zaitchik wanted to legally adopt him so that Fowler could become the heir to Zaitchik's crime empire, even though Fowler had never met Zaitchik. Fowler was led to this belief because he started receiving Facebook messages from "Frank Zaitchik" indicating a desire to develop a close father-son relationship and because Younger, known to Fowler as Jenna, passed along messages that she had supposedly received from Zaitchik. After a while, Younger showed Fowler adoption papers on her computer that Zaitchik supposedly had sent her. Zaitchik

6

indicated through his Facebook messages that he had no children and wanted an heir, but Fowler would have to carry out certain activities to prove himself worthy of and loyal to Zaitchik's syndicate. This included ferreting out rival Mexican crime families who were attempting to undercut Zaitchik's business.

Among other things, Zaitchik told Fowler that two bodyguards named Gino and Kip had been assigned to shadow and protect him as he travelled from fair to fair. Although Fowler never actually saw either of these two men, he believed they were real because Zaitchik always seemed to know what Fowler was doing almost as soon as he did it.

After a time, Zaitchik communicated to Fowler that he would have to carry out a killing so that he would have blood on his hands and would not be able to walk away from his "family." Zaitchik directed Fowler to scout out vehicles at various fairs, which Zaitchik would screen based on their license plates and determine whether they belonged to Mexican drug cartel members. When the time was right, Zaitchik would tell him whom he had to kill.

Also caught up in this scheme were Rusty Frasier and his girlfriend, Christine Tenney. They worked at the carnival and shared a unit in the same bunkhouse as Fowler and Younger. They understood that Fowler was destined to inherit a fortune, and Younger gave them instructions, supposedly provided by Zaitchik, on how they were to assist Fowler. Younger told Tenney that it was Fowler who was supposed to complete the kills, and it was Frasier's and Tenney's job to help him. Younger mentioned another carnival worker, Zach Panacek, as a possible target. The final member of this group was Fowler's nephew, Thomas Drake, who also worked for the carnival.

On the evening of Friday, July 13, 2018, Younger took breaks from her ticket-selling job and talked with Alfred Carpenter about possibly buying his trailer and camper.

7

Zaitchik supposedly sent Fowler Facebook messages telling him the Carpenters were going to be the target. Late that night, Younger invited Alfred out of the camper to talk with Fowler about the camper. According to Fowler and Frasier, her plan was that Fowler was to slit Alfred's throat with a knife while Younger distracted Alfred. Alfred fought back, however, almost gaining the advantage over Fowler. Frasier, who was backing Fowler up, rushed in to intervene and stabbed Alfred with a different knife. Then Fowler shot Alfred twice. He proceeded into the trailer, where Pauline was getting out of bed, and shot her four times, mortally wounding her.

Following Younger's instructions (again supposedly provided by Zaitchik), the foursome then put Alfred's body in the camper near Pauline's and cleaned up around the site. Tenney and Drake participated in the cleanup, obtaining bleach and other cleaning supplies. With Younger driving, they took off with the trailer attached to the truck and camper in the early morning of July 14.

After several stops along the way, including a stop to replace a flat tire on the trailer, they arrived in Van Buren, Arkansas. Fowler's daughter and son-in-law were living in an apartment complex there called Vista Hills, and the group stayed with them. From there they took the camper to an unpopulated area in Ozark National Forest, where Fowler's son-in-law and the boyfriend of another daughter assisted them in putting the bodies in a shallow ravine and covering them with a mattress and some rocks and dirt. While they were away, Tenney secretly contacted her sister and told her she was with a group of individuals who had murdered two people and she needed help. The sister then contacted law enforcement.

Responding to the call from Tenney's concerned sister, Van Buren police went to the apartment to investigate whether Tenney was being held against her will. When they arrived, they sought out the manager. Meanwhile, Alfred and Pauline's daughters were

8

becoming worried that their parents had not returned home and were not answering their phones. They contacted law enforcement in Wichita.

While the police were looking around the apartment complex, Younger approached and told them her name was Tiffany Jones and she helped the apartment manager out on nights and weekends. Police noticed the camper with a Kansas license plate and inquired about Alfred and Pauline. Younger said she knew the couple and they had wanted to play at a nearby casino. She said she took them to a car rental place so they could drive to the casino without having to take the camper. Although a data check revealed that the truck and camper were registered to Alfred and Pauline Carpenter of Wichita, the police had no definitive evidence of foul play and they returned to their station.

After investigating inquiries about the Carpenters from the Van Buren police, an officer with the Wichita Police Department informed the Van Buren police that the Carpenters were not at their home and their daughters were worried that something had happened to them. A check of their own files led the Van Buren police to conclude that the woman who identified herself as "Tiffany Jones" was not really Tiffany Jones. This was sufficient for the police to deem Younger in violation of Arkansas law under theories of criminal impersonation or obstruction of government operations, and they returned to the Vista Hills apartment complex.

While obtaining more information about the Carpenters' disappearance, the police noticed Younger driving back to the parking lot. She again told them her name was Tiffany Jones. When one of the officers obstructed her path to the second-story apartment, she became belligerent, and he placed her under arrest. He handcuffed her, took her cell phone, and placed her in the back of the squad car.

9

Younger then said she would tell him the truth and told him her name was Myrna Khan. While the officer continued to investigate the situation, he left her alone in the back of the car, but he turned on audio and video recording devices in the car. While she was sitting alone in the back seat for about two hours, Younger made various comments out loud that were incriminating and were recorded without her knowledge.

She was then transported to the police station, and, a few hours later, was interviewed by Sergeant Daniel Perry. Another officer occasionally helped out, and later, at Younger's request, the local county attorney sat in on the interview. During the course of the interview, Younger asked to speak to Fowler privately. Unbeknownst to her, Fowler had agreed to wear a wire, and their conversation was recorded. Police also asked Younger if they could search her backpack. She agreed and signed a consent form. In the backpack, the officers found the handgun that had been used to kill the Carpenters.

Assisted by Younger's coconspirators and Fowler's family members, police located the victims' bodies fairly quickly. Fowler and Frasier were detained and eventually confessed to having killed the Carpenters. While Younger was being interviewed at the station, the others started cooperating with law enforcement almost immediately.

Younger initially denied that any murder had taken place, but she eventually told an elaborate version of what had happened, blaming the events on a crime syndicate directed by a man named Frank Zaitchik, whose hired hitman, a carnival employee named Fred Viney, carried out the killings and forced her and her friends to clean up the site and dispose of the vehicles and bodies.

On December 6, 2018, the State filed a complaint charging Younger with one count of capital murder of Alfred and Pauline, an alternative count of first-degree premeditated murder of Alfred, an alternative count of first-degree murder of Pauline,

10

one count of conspiracy to commit premeditated first-degree murder, one count of solicitation to commit first-degree premeditated murder, and one count of theft of property valued between $25,000 and $100,000.

Before Younger's trial, Fowler pleaded guilty to two counts of premeditated first-degree murder and one count of felony theft, and he received two consecutive hard 50 life sentences for the murders. This court affirmed the denial of his motion for a downward departure sentence in *State v. Fowler*, 315 Kan. 335, 508 P.3d 347 (2022). Frasier pleaded guilty to two counts of first-degree murder. Tenney pleaded guilty to one count of obstruction of justice and one count of aggravated robbery.

All three would testify against Younger at her trial, which was conducted in September 2021 and lasted nine days. Before jury deliberations began, the State voluntarily dismissed counts two and three, the alternative individual counts of first-degree murder of Alfred and Pauline. The jury found Younger guilty of count one, capital murder; count four, conspiracy to commit first-degree murder of Alfred; count five, solicitation to commit the first-degree murder of Alfred; and count six, theft.

For the primary on-grid offense of conspiracy to commit first-degree murder, the court sentenced Younger to a guideline sentence of 174 months. For the conviction for solicitation to commit first-degree murder, the court sentenced her to a standard term of 59 months. For the theft count, the court sentenced her to a standard sentence of 12 months. These sentences were to run consecutive to each other and to the sentence for the first count, which was capital premeditated murder. For that crime, she was sentenced to an off-grid term of lifetime imprisonment with no possibility of parole. The court further ordered restitution of $34,427.46 and ordered Younger to make regular payments of the amount of 25 percent of her monthly personal income.

*Right to Confront Witness*

Younger contends her constitutional right to confront witnesses against her was violated when the State's rebuttal witness Frank Zaitshik was allowed to testify remotely.

Throughout the trial, evidence was introduced showing that the other participants in the murders believed "Frank Zaitchik" was the boss of a crime family who adopted Michael Fowler and required him to commit a murder in order to be fully accepted into the family. By means of Facebook messages to Fowler and Frasier and supposed messages to Younger, which she passed on to Fowler and Frasier, the purported Zaitchik gave detailed, often minute-by-minute instructions to the two men on how they were to proceed. In addition, testifying in her own defense, Younger asserted that Zaitchik ran a criminal enterprise, paid her to transport drugs and guns around the country, and hired bodyguards to shadow Fowler and protect him from a supposed hitman.

In rebuttal, the State called on Frank Zaitshik to testify. Over Younger's written and oral objections, the court allowed Zaitshik to testify by means of a two-way live video exchange that took place before the jury. The court allowed this exceptional form of testimony because of Zaitshik's concerns about COVID-19, which was surging at the time. In a fairly brief appearance, Zaitshik testified he had no connections with criminal enterprises, he had no idea who Fowler or Younger (either by her given name or her various aliases) were, he had never directed anyone to commit murders, and he did not have Italian ancestry.

On appeal, Younger argues that allowing Zaitshik to appear by video technology violated her right under the Kansas and United States Constitutions to confront witnesses against her.

*Standard of Review*

This court employs an unlimited standard of review when addressing issues relating to the Confrontation Clause of the United States Constitution and section 10 of the Kansas Constitution Bill of Rights. See, e.g., *State v. Belone*, 295 Kan. 499, 502, 285 P.3d 378 (2012); *United States v. Cotto-Flores*, 970 F.3d 17, 39 (1st Cir. 2020) (whether trial judge made specific findings sufficient to permit the use of closed-circuit television testimony is a legal issue subject to de novo review).

When the trial court makes the required specific findings, however, that decision may be reviewed for clear error. See *Hernandez v. New York*, 500 U.S. 352, 369, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991) (when there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous); *United States v. Cox*, 871 F.3d 479, 484 (6th Cir. 2017) (factual findings of district court supporting closed-circuit television testimony are reviewed for clear error).

A violation of the Sixth Amendment Confrontation Clause is subject to harmless error analysis. See, e.g., *State v. Bennington*, 293 Kan. 503, 524, 264 P.3d 440 (2011). Under this standard, this court must be persuaded beyond a reasonable doubt that the error did not affect the trial's outcome in light of the entire record, which is to say, there was no reasonable possibility that the error affected the verdict. The prosecution, as the party benefiting from the error, bears the burden of showing the error was harmless. 293 Kan. at 524.

*Analysis*

The Confrontation Clause of the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. That guarantee applies to criminal

13

defendants in both federal and state prosecutions. See *Pointer v. Texas*, 380 U.S. 400, 406, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965) (Sixth Amendment applicable to states through the Fourteenth Amendment). Similarly, a criminal defendant in Kansas has the right to "meet the witness[es] face to face." Kan. Const. Bill of Rights, § 10. Younger maintains her rights under both Constitutions were violated.

A.     Federal Constitutional Right to Confront Witnesses

In *Pointer*, 380 U.S. 400, the Supreme Court held that the Sixth Amendment right to confront witnesses is a fundamental right.

The impetus to the Sixth Amendment was "the practice of trying defendants on 'evidence' which consisted solely of ex parte affidavits or depositions secured by the examining magistrates, thus denying the defendant the opportunity to challenge his accuser in a face-to-face encounter in front of the trier of fact." *California v. Green*, 399 U.S. 149, 156, 90 S. Ct. 1930, 26 L. Ed. 2d 489 (1970).

This court has emphasized the cross-examination aspect of the right to confront witnesses, holding that the primary purpose of the Confrontation Clause is to give the accused the opportunity for cross-examination to attack the credibility of witnesses for the State. Such cross-examination is essential to a fair trial and helps assure the accuracy of the truth-determination process. *State v. Thomas*, 307 Kan. 733, 738, 415 P.3d 430 (2018); *State v. Friday*, 297 Kan. 1023, Syl. ¶ 19, 306 P.3d 265 (2013).

This court has held, however, that a defendant's fundamental right to a face-to-face confrontation with an adversarial witness is not absolute and is subject to narrow exceptions when necessary to further important public policies. *State v. Chisholm*, 245 Kan. 145, 150, 777 P.2d 753 (1989). In order to meet constitutional requirements, a judge must make an individualized determination that an exception is necessary to fulfill other

important policy needs. 245 Kan. at 150 (discussing requirements in context of K.S.A. 22-3434 child testimony out of presence of defendant).

A year later, the United States Supreme Court agreed in *Maryland v. Craig*, 497 U.S. 836, 110 S. Ct. 3157, 111 L. Ed. 2d 666 (1990). The Supreme Court adopted a two-part test to evaluate a Confrontation Clause challenge to a Maryland statute allowing a child abuse victim to testify outside the presence of the criminal defendant using one-way, closed-circuit television. The Supreme Court held that "a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." *Craig*, 497 U.S. at 850.

When evaluating the reliability of the testimony under the second part of the *Craig* test, the Supreme Court found it "significant" that, apart from a face-to-face confrontation, "Maryland's procedure preserves all of the other elements of the confrontation right:  The child witness must . . . testify under oath; the defendant retains full opportunity for contemporaneous cross-examination; and the judge, jury, and defendant are able to view (albeit by video monitor) the demeanor (and body) of the witness as he or she testifies." *Craig*, 497 U.S. at 851. The Court noted that the presence of these key elements of confrontation "ensures that the testimony is both reliable and subject to rigorous adversarial testing in a manner functionally equivalent to that accorded live, in-person testimony." 497 U.S. at 851. Given the presence of these safeguards, the Court ultimately concluded that "to the extent that a proper finding of necessity has been made, the admission of such testimony would be consonant with the Confrontation Clause." 497 U.S. at 857.

Younger argues on appeal that the reasons given for allowing Zaitshik to testify remotely were insufficient to override her constitutional right to in-person confrontation.

15

In light of the State's pretrial motion to allow Zaitshik to appear via a tele-video conference and Younger's objection to that motion, the trial court held an evidentiary hearing on the motion at which Zaitshik made a virtual video appearance by Zoom.

Zaitshik was in Syracuse, New York, on business at the time. His home was in Florida. He testified he was 75 years old and he believed he had increased risks for severe illness if he contracted COVID. He had high blood pressure and was 50 pounds overweight. Although he had been flying recently, it had been seven months since his vaccination and there were increasing numbers of break-through COVID cases, so he did not plan on flying anymore. He also was no longer going into restaurants or other indoor public places. When he met with people in the course of business, he limited his interactions to people who he knew were fully vaccinated and who maintained social distancing outside. He told the court that the spread of the Delta variant was making him "more and more nervous." "I don't want to gamble with my life. I'm only doing what I absolutely have to do to remain in the world post-COVID."

The judge stated he was aware that Barton County was "a hot spot," and the Barton County Jail had cases in the jail among both the inmates and staff. The judge opined that danger to the witness sufficed to allow an exception to the in-court confrontation clause requirement. He held the video connection would suffice to allow meaningful examination and cross-examination and granted the State's motion, overruling Younger's objection.

At the time of the trial, COVID presented a very real threat. The country was experiencing the peak of the second surge of the pandemic. Younger herself filed a voluntary consent to appear by audio or video conference and to waive a public court proceeding at the depositions of Tenney and Frasier because of the COVID risks and precautionary measures. On the fifth day of the jury trial, a juror called in and reported he

16

had tested positive for COVID, and the court then asked the county medical officer to come in and test all the other jurors, the court staff, the attorneys, and the judge. One juror refused to be tested and was sent home. The remaining individuals tested negative, and the trial continued with alternate jurors.

An analogous situation arose in *United States v. Akhavan*, 523 F. Supp. 3d 443, 455 (S.D.N.Y. 2021). A witness for the prosecution was 57 years old and had been diagnosed with hypertension and atrial fibrillation. It appeared no one in his household had been vaccinated against COVID. He and his wife were the primary caretakers of the witness' 83-year-old mother-in-law. He lived in California and would have to travel by commercial flight to testify at the trial in New York. The defendants objected on Confrontation Clause grounds.

The court examined the witness' circumstances and specifically found:

"[The witness'] age and preexisting conditions place him at increased risk of serious illness or death if he were to contract COVID-19. The CDC has found that people aged 50-64 are 400 times more likely to die and 25 times more likely to be hospitalized from COVID-19 than children aged 5-17 years, and are more than 25 times more likely to die and 3 times more likely to be hospitalized than young adults aged 18-29. On top of that, 'adults of any age' with 'heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies' 'are at increased risk of severe illness' from COVID-19, and 'adults of any age' with hypertension 'might be at an increased risk for severe illness.'" *Akhavan*, 523 F. Supp. 3d at 452.

The court found the witness' circumstances "exceptional" and granted his request to testify by two-way video. *Akhavan*, 523 F. Supp. 3d at 456. The Second Circuit affirmed on that issue, holding there was no clear error in the district court's findings. *United States v. Patterson*, No. 21-1678-CR, 2022 WL 17825627, at *4 (2d Cir. 2022) (unpublished opinion), *cert. denied sub nom. Weigand v. United States*, ___ U.S. ___,

17

143 S. Ct. 2639 (2023). See also *State v. Comacho*, 309 Neb. 494, 515-16, 960 N.W.2d 739 (2021) (remote testimony of a witness who had tested positive for COVID-19); *State v. Milko*, 21 Wash. App. 2d 279, 290-94, 505 P.3d 1251 (2022) (remote testimony of a witness whose child had compromised health); *State v. Johnson*, No. 1-CA-CR 21-0015, 2021 WL 5457502, at *2 (Ariz. Ct. App. 2021) (unpublished opinion) (remote testimony permitted based on a witness' age and "significant health issues" as well as the risk of travel out of state and "the need to minimize the risk and spread of COVID-19"); *State v. Roberson*, No. A21-0585, 2022 WL 664184, *2-3 (Minn. Ct. App. 2022) (unpublished opinion) (remote testimony of an immunocompromised witness); *Commonwealth v. Cuevas*, No. 930 MDA 2021, 2022 WL 2112998, *8-9 (Pa. Super. 2022) (unpublished opinion) (remote testimony of a witness who awakened on the day of trial with a fever).

Here, the trial court, after hearing testimony and argument, held:

> "I will also mention his concerns are related to COVID. He is 78 [*sic*] years old. He does have other issues related to his . . . concerns over COVID. As the State has mentioned, also the Court is aware that . . . Barton County . . . is a hot spot. And specifically Barton County Jail has had cases in the jail, both among the inmates, as well as staff, which raises further concerns. And there's issues over an appropriate booster shot. . . . I'm going to overrule the objection."

Although the trial court might have reasonably ruled differently, the concerns over the spiking pandemic suffice to allow an at-risk witness to testify remotely. The evidence supported the trial court's decision.

Younger argues at length that video testimony is subject to technical problems and has sometimes proved inferior in other proceedings. But she makes no showing that Zaitshik's testimony to the jury had any technical difficulties or that Zaitshik did not understand what was going on. The transcript contains no suggestion that the court reporter had any difficulty understanding the testimony.

Younger's counsel suggested no problems in communicating with Zaitshik and engaged with him in a full cross-examination. In *Craig*, 497 U.S. at 852, the Court held that "use of [a] one-way closed circuit television procedure, where necessary to further an important state interest, does not impinge upon the truth-seeking or symbolic purposes of the Confrontation Clause."

Younger also contends that Zaitshik was, at most, only temporarily unavailable, and remote testimony should not be permitted for witnesses who might be available at some indeterminate later time. She suggests, for example, that the pandemic had ebbed by May 1, 2023, implying that the trial could have been postponed for a couple of years until Zaitshik's concerns were mitigated. We note that Zaitshik would have been even older if the trial had been postponed; his blood pressure might have become an even greater concern, as also his weight. And other witnesses would have been years further down the road from the events about which they were testifying.

Younger suggests other alternatives. A pretrial deposition might have been used instead of the Zoom testimony. But she does not explain how a recorded deposition is a better alternative than live remote testimony, and Zaitshik was called as a rebuttal witness, meaning that it was not necessarily viable for the State to know what testimony he would have to rebut. She also notes that the trial court employed measures to reduce the risk of COVID transmission in the courtroom. It is unknown how effective such measures were or how they might have mitigated Zaitshik's special health concerns.

Perhaps Younger's most compelling argument is that Zaitshik had traveled to Oklahoma shortly before the trial: if he could safely travel to Oklahoma, why could he not safely travel to Barton County, Kansas? While this is a fair question, the trial judge considered a constellation of factors, including Barton County's particular COVID risks, in reaching an informed decision that the circumstances justified admitting Zaitshik's

remote testimony. We will not second-guess this legitimate determination by the trial judge.

We have reviewed the trial court's findings and determine they were legally sufficient and were supported by the record. Because the trial court chose between two permissible views of the evidence, we will not find clear error in that choice. See *Hernandez*, 500 U.S. at 369. We therefore find no violation of the federal Constitution's Confrontation Clause and no error in allowing Zaitshik to testify remotely.

B.      State Constitutional Right to Meet Witnesses Face to Face

Younger argues broadly without elaboration that section 10 of the Kansas Constitution Bill of Rights provides rights that are "distinct from and broader than the Sixth Amendment text."

This argument was not made to the district court and is therefore not preserved for appeal. Younger's attorney quoted from section 10 but then argued the objection as if it were a Sixth Amendment objection. As her attorney stated at argument on the objection: "Judge, you have my objection. Yes, it is based on confrontation grounds." The written objection made no claim that the Kansas Constitution provides greater protection in this arena than the federal Constitution.

Issues not argued before the district court may not be asserted on appeal. See *State v. Daniel*, 307 Kan. 428, 430, 410 P.3d 877 (2018); *State v. Kelly*, 298 Kan. 965, 971, 318 P.3d 987 (2014). Here, Younger's counsel explicitly told the trial court his objection was grounded on federal constitutional confrontation considerations. Furthermore, Younger does not present in her appellate brief any analysis or support, either historical or in caselaw, for her proposition that section 10 is to be understood to provide different protections from the Sixth Amendment. While we note the extensive discussion of this

20

subject in the brief of the amicus curiae, in the absence of argument to the trial court or analysis by the appellant to this court, we conclude this is not the appropriate case to decide whether section 10 provides defendants with greater protection than the Sixth Amendment.

*Admission of Younger's Statements to Police*

While waiting in the police car at the apartment complex, Younger made statements to the police before she had received notification of her *Miranda* rights. She also made unsolicited statements while sitting alone in the car, and these statements were recorded. Later, at the police station, she signed a form stating that she understood her rights and then talked about wanting a lawyer. Although she did not get to speak with a lawyer, she proceeded to make a number of statements to police.

The trial court suppressed some of the statements but allowed the jury to hear others over her objections. During her interview, Younger also asked to speak with Fowler. Fowler privately agreed to wear a recording device, and the statements she made to him were admitted at trial. She contends on appeal that these statements should have been suppressed and her convictions should be reversed.

*Standard of Review and Rules Relating to the Suppression of Evidence*

In order to be admissible as evidence, statements by a defendant who is in custody and subject to interrogation must be voluntary and, in general, made with an understanding of the defendant's constitutional rights. See, generally, *State v. Parker*, 311 Kan. 255, 257-58, 459 P.3d 793 (2020); *State v. Mattox*, 305 Kan. 1015, 1042-43, 390 P.3d 514 (2017).

Statements made during a custodial interrogation must be excluded under the Fifth Amendment to the United States Constitution unless the State demonstrates it used procedural safeguards, i.e., *Miranda* warnings, to secure the defendant's privilege against self-incrimination. These safeguards are triggered only when an accused is (1) in custody and (2) subject to interrogation. *Parker*, 311 Kan. at 257.

This court applies a dual standard when reviewing a decision ruling on a motion to suppress a confession. It reviews the factual underpinnings of the trial court's ruling under a substantial competent evidence standard. It reviews the ultimate legal conclusion drawn from those facts de novo. It does not reweigh the evidence, assess the credibility of the witnesses, or resolve conflicting evidence. *State v. Dern*, 303 Kan. 384, 392, 362 P.3d 566 (2015).

The voluntariness of a waiver of a defendant's *Miranda* rights is a question of law that an appellate court determines de novo based on the totality of the circumstances. *Parker*, 311 Kan. at 257; *Mattox*, 305 Kan. at 1042; *State v. Kirtdoll*, 281 Kan. 1138, 1144, 136 P.3d 417 (2006).

The voluntariness of a defendant's *Miranda* rights waiver can be implied under the circumstances. *Kirtdoll*, 281 Kan. 1138, Syl. ¶ 1. Certain factors may contribute to a finding of voluntariness, such as the defendant explicitly saying that he or she understood his or her rights and then proceeding to answer questions. 281 Kan. at 1146-47; see also *State v. Wilson*, 215 Kan. 28, 30, 523 P.2d 337 (1974) (when defendant says he or she understands his or her rights and makes no showing that statements were coerced or in some other way involuntary, *Miranda* safeguards are satisfied).

A suspect can invoke the *Miranda* right to counsel at any time by making, at a minimum, some statement that could be reasonably construed as an expression of a desire for the assistance of an attorney during a custodial interrogation. *State v. Moore*, 311

22

Kan. 1019, 1035, 469 P.3d 648 (2020). Courts review requests for attorneys during custodial interrogation by looking for two components: (1) "the suspect 'must articulate his desire to have counsel present sufficiently clearly that [an objectively] reasonable police officer in the circumstances would understand the statement to be a request for an attorney'"; and (2) "the request must be for assistance with the custodial interrogation, not for subsequent hearings or proceedings. '" *Moore*, 311 Kan. at 1035.

Law enforcement must scrupulously honor a suspect's clear invocation of *Miranda* rights, which cuts off any further interrogations elicited by express questioning or its functional equivalent. *Moore*, 311 Kan. at 1035. A suspect's responses to postinvocation questions may not be used to cast retrospective doubt on the clarity of the initial invocation. *State v. Aguirre*, 301 Kan. 950, 957-58, 349 P.3d 1245 (2015) (citing *Smith v. Illinois*, 469 U.S. 91, 100, 105 S. Ct. 490, 83 L. Ed. 2d 488 [1984]).

Once a suspect has invoked *Miranda* rights, there may be no further questioning unless the suspect (a) initiated further discussions with the police and (b) knowingly and intelligently waived the previously asserted right. *Aguirre*, 301 Kan. at 961. See also *State v. Salary*, 301 Kan. 586, 604, 343 P.3d 1165 (2015) ("[I]f the accused has unambiguously invoked the right to counsel, questioning must cease immediately and may be resumed only after a lawyer has been made available or the accused reinitiates the conversation with the interrogator.").

The State has the burden to prove the voluntariness of a confession by a preponderance of the evidence—that the statement derived from the defendant's free and independent will. The court looks at the totality of the circumstances surrounding the confession to determine whether the confession was voluntary by considering the following nonexclusive factors: (1) the defendant's mental condition; (2) the manner and duration of the interrogation; (3) the ability of the defendant to communicate on request with the outside world; (4) the defendant's age, intellect, and background; (5) the fairness

23

of the officers in conducting the interrogation; and (6) the defendant's fluency with the English language. *State v. Bentley*, 317 Kan. 222, 228-29, 526 P.3d 1060 (2023).

A.    Younger's Statements in the Police Car

After patrolman Kevin Dugan arrested Younger, he handcuffed her, confiscated her cell phone, and placed her in the back of his patrol car. He activated the car's electronic recording equipment and then went to investigate other individuals in the vicinity. He did not explain her *Miranda* rights to her at that time. She was left alone in the car for about two hours. While she was alone in the car, Younger made several statements out loud that were picked up electronically and recorded. Among other things, she said, "'Get rid of the gun,'" and "'Don't break, Scott.'" (Scott Spencer was Fowler's son-in-law.) She also repeatedly said, apparently commenting to the police, "'Stop talking to them. Talk to me.'" Younger sought to suppress these statements, but the trial court allowed the jury to hear them.

The trial court allowed the State to introduce the answers Younger gave to the questions about her name and her spontaneous interjections she made afterwards while she was alone in the car. She argues on appeal that the introduction of these statements was erroneous and prejudicial.

No one was present when Younger made her statements, and no one was asking her questions. The procedural safeguards of *Miranda* are not required when a suspect is simply taken into custody; they only begin to operate when a suspect in custody is subjected to interrogation. See *Rhode Island v. Innis*, 446 U.S. 291, 300, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980); *State v. Dudley*, 264 Kan. 640, 642, 957 P.2d 445 (1998).

The surreptitious tape recording of a defendant's statements while seated in the rear of a marked police car does not violate the defendant's rights against compelled self-

24

incrimination. See, e.g., *State v. Edrozo,* 578 N.W.2d 719 (Minn. 1998). When officers say nothing at all to prompt spontaneous statements from a suspect, there is no basis for finding even subtle compulsion. *Dudley*, 264 Kan. at 644.

"Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. . . . Volunteered statements of any kind are not barred by the Fifth Amendment. . . ." *Miranda v. Arizona*, 384 U.S. 436, 478, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). "'[A]n accused's statement may be found to be voluntary and spontaneous and, thus, admissible even though it is made after the accused is arrested and in custody.' [Citations omitted.]" *State v. Richardson*, 256 Kan. 69, 86, 883 P.2d 1107 (1994) (quoting *State v. Mooney*, 10 Kan. App. 2d 477, 480, 702 P.2d 328, *rev. denied* 238 Kan. 879 [1985]).

The State properly cites to cases holding there was no *Miranda* violation when suspects were left alone in the back seats of police cars. See, e.g., *United States v. Hernandez-Mendoza*, 600 F.3d 971, 977 (8th Cir. 2010) (leaving defendants alone in a police car with recording device activated was not functional equivalent of interrogation; no *Miranda* violation); *Stanley v. Wainwright*, 604 F.2d 379, 382 (5th Cir. 1979) (no *Miranda* violation when police recorded suspects left alone in back of a police car because *Miranda* "does not protect spontaneous utterances made by detainees"); *United States v. Colon*, 59 F. Supp. 3d 462 (D. Conn. 2014) (rejecting argument that recorded statements of codefendants left alone in back of police vehicle were product of custodial interrogation).

While it is true that Younger was in custody and was unaware that her statements in the car were being recorded and could be used against her, she was not constitutionally protected from incriminating herself by making spontaneous statements and there was no error in admitting her outbursts.

B.      Younger's Interview Statements

Following her arrest and transport to the Van Buren police station, various officials took part in an interview with Younger. The interview was recorded and transcribed. It began at around 5:10 a.m. and continued, with numerous interruptions, for about five hours. At the outset, Younger was informed of her *Miranda* rights and signed a document acknowledging she understood them.

During the interview, Younger initially denied knowing anything about anyone being killed. She averred that Fowler and Frasier had done nothing wrong. After a time, she announced she would tell investigators everything that happened. She told them her legal name was Kimberley Younger, and she proceeded to recount an involved story about a "carnival mafia" crime lord named "Frank Zaitchik" who had taken control of Fowler's, Frasier's, and her own lives. She denied involvement in murdering anyone, but she claimed she and her friends were forced to clean up after the murders by a Zaitchik hitman who threatened her life if she resisted. She mentioned that she was diabetic and needed periodic insulin shots. And she occasionally said she wanted an attorney, but she provided her longest narrative after she told the interrogating officer that she would speak without counsel.

At the outset, Younger told the police officer that she had not had her insulin, which she would normally take around 1:00 a.m. She mentioned a previous arrest for a DWI, and then said her name was Myrna Khan. The officer then went over her *Miranda* rights with her, asking her if she understood each one, and she replied she did. He then said:

> "Get you to sign right there please, ma'am. Okay this next part down here, Myrna, it says
> no promises or threats have been used against me to induce me to waive the rights listed
> above. With full knowledge of my rights, I hereby knowingly and intelligently waive

26

them and agree to answer questions. That's just basically sayin' I haven't promised you anything and I haven't threatened you to make you talk to me, okay?"

She answered:  "I'm not waiving my rights. I'm saying that I'll talk to you."

He said in response:  "That's not saying you're givin' up your rights. These are always your rights. And I can't—there's nobody that can take those rights away from you, okay? Lemme go see if he found some cigarettes, okay?" She then inquired about where her own cigarettes and phone were. After a cigarette break, the two engaged in a dialogue in which the officer said he was investigating the missing people and he had already talked with Fowler, Frasier, and Tenney. He told her the others had cooperated and helped police find the victims' bodies. She then denied the existence of any murder victims and said she did not believe the others had told the police anything about the murders. She said, "I'm not involved in any of this." The officer then offered her an opportunity to smoke a cigarette if she would calm down and stop "actin' crazy and yellin'."

After a cigarette and water break, the following exchange took place:

> "[Younger]:  Send someone in here.
> "[Officer]:  Yes
> "[Younger]:  Can you ask that detective to come in please?
> "[Officer Perry]:  (Returns to the room.) Hey, what's up?
> "[Younger]:  I will tell you exactly what happened.
> "[Officer Perry]:  Okay.
> "[Younger]:  But I need two conditions.
> "[Officer Perry]:  Okay.
> "[Younger]:  First I want an attorney here.
> "[Officer Perry]:  Okay.
> "[Younger]:  Second, I wanna talk to my husband privately.
> "[Officer Perry]:  Okay.

27

"[Younger]: I'd prefer it to be outside where he and I can both have a cigarette because I'm sure he's Jonesin' as bad as I am.

"[Officer Perry]: Okay.

"[Younger]: If you will agree to those, I will tell you exactly what happened. But you must promise to protect him and I. Christine and Rusty were not involved.

"[Officer Perry]: Okay?

"[Younger]: Let them go.

"[Officer Perry]: Do you understand that I've gotta run everything out through—I can't promise you that but I can—I'll have to talk to the prosecutor and he'll have to—

"[Younger]: I don't know why they're admitting to something they didn't do. It's bothering me. I don't know why. And when you hear what I have to say, you'll understand why Mike and I did what we did. But we are still not involved in killing those people.

"[Officer Perry]: Okay.

"[Younger]: But I need a—a lawyer here to make sure that my rights aren't bein' trampled on.

"[Officer Perry]: Okay.

"[Younger]: Because if we go against the—the people that did do this, it'll get us dead, even if we're in prison.

"[Officer Perry]: Okay. Lemme talk to the prosecutor, okay? Fair enough? Everything has to go through him and you know that. Okay?

"[Younger]: Unfortunately I do."

Perry left the room. There followed a restroom and a cigarette break. Younger said she needed her insulin because her blood sugar was rising. Perry returned to the room, and another exchange took place:

"[Officer Perry]: Um, I talked to the prosecutor and he said he didn't have any problem with that. Um, do you have a lawyer? Or you—

"[Younger]: No.

"[Officer Perry]: —would you be like the—

"[Younger]: I can't call the lawyer that I know.

"[Officer Perry]: Okay. Um—

28

"[Younger]: That would throw everything—that would put Michael's and my life in complete danger. The longer we spend at this Police Station, the less likely I'm gonna be able to explain it all away. (Nods head.) And you're gonna want me to explain it all away.

"[Officer Perry]: Okay. This is my deal and I'm just gonna be honest with ya. If I bring an attorney in here, period, he's probably gonna tell you don't talk. You know that.

"[Younger]: I can't listen to him.

"[Officer Perry]: Okay, I'm—I just—you that's probably what he's gonna say.

"[Younger]: I just want him to protect my rights.

"[Officer Perry]: I gotcha.

"[Younger]: This story is something you're gonna have a hard time swallowing until you get all the details.

"[Officer Perry]: Okay. Fair enough."

The two then talked about Younger's phone and email accounts. Next, they talked about her request to talk with Fowler. She said she wanted to talk to him outside the interview room and she would agree to them both being handcuffed. When Perry said he would have to accompany them outside, Younger said, "I just don't want you close enough that you can hear what I'm sayin'." She asked for five minutes to talk with Fowler so she could "explain it to him."

Perry and Younger then resumed their discussion of having an attorney:

"[Younger]: And then I will tell you everything but it'd be easier to get your prosecuting attorney in here. And let them hear it all at the same time.

"[Officer Perry]: Okay. Are you still wantin' your attorney in here?

"[Younger]: I'd like an attorney—and I know they're gonna tell me don't talk. But in this case I don't have anything to fear from a capital crime because I didn't commit a capital crime.

"[Officer Perry]: Would a—would a public defender be okay?

"[Younger]: That'd be fine.

"[Officer Perry]: Okay.

29

"[Younger]:  Long as they've been an attorney and know what an attorney—

"[Officer Perry]:  Oh, yeah, absolutely.

"[Younger]:  —uh, and client—

"[Officer Perry]:  Just have a seat a minute and lemme go get him . . . and I'll be right back, okay?

"[Younger]:  . . . [O]kay."

Younger then left the room in handcuffs to talk with Fowler. When she returned, she was left alone in the interview room for a while. She said out loud,

"Come on, this is ridiculous. Either you want my information or you don't. Come on, you've had me in this room for over a fuckin' hour now. It's not like I'm gonna run away, goddamn. Come on. You people are gonna get me killed. Come on. Come on. Come on, lemme have a cigarette. Fuck me."

Perry returned, and the two resumed talking.

"[Officer Perry]:  Uh, um, got the prosecutor here. We're not able to get a public defender yet. But went and got y'all's property outta the room—

"[Younger]:  Yeah?

"[Officer Perry]:  —okay? Um, would you have a problem if we went through it and made sure there's nothin' illegal in it? You good with that?

"[Younger]:  There shouldn't be anything in there but now can I have a cigarette now please?

. . . .

"[Younger]:  I, I don't get why you don't have a prosecutor in here.

"[Officer Perry]:  I've got a prosecutor.

"[Younger]:  What I'm gonna tell you is—

"[Officer Perry]:  You're gonna—are you gonna talk to me without an attorney?

"[Younger]:  Yes.

"[Officer Perry]:  I—

"[Younger]:  That's what Michael told me to do.

"[Officer Perry]:  Without an attorney?

30

"[Younger]: Yes.

"[Officer Perry]: Okay. Okay. We'll do that right now.

. . . .

"[Younger]: Are you guys gonna talk to me anytime soon?

"[Officer Perry]: Yeah, we're . . . fixin' to. We're fixin' to. Fixin' to get 'er done."

Perry left the room and returned with the county attorney. Younger thereupon launched into a lengthy narrative in which she spoke of a carnival underworld, a powerful mob boss named Frank Zaitchik, secretive protectors who followed Fowler and her around the carnival circuit but who were never seen, and a vicious hitman who killed the Carpenters and who compelled her and her friends to clean up the crime scene and dispose of the camper, the trailer, and the bodies.

She then said, "I don't have anymore to say. I wanna talk to a federal prosecutor. . . . I would like to speak to a federal prosecutor and a—and an attorney please." After the others left her alone in the interview room, she said out loud,

"Gonna get us killed. You're gonna get us killed. The organization is gonna kill us and you guys are sittin' there. They did what—but made it even fuckin' worse. Ugh. Fine, I'll talk without one. Fine, I'll talk. Still want a federal prosecutor. Oh, god, come on. May I use the bathroom please."

Perry returned and said a lot of things were not matching up with what she said. The two talked a little bit longer about her phone and why everyone but her was lying.

The interview concluded with Perry interrupting her statement by saying, "You lawyered up. You lawyered up." She continued to try to speak about what the other accused people said, but Perry again interrupted her to say, "[W]e're done. . . . [Y]ou lawyered up so I'm not gonna talk to you about that part. Okay?"

31

In addressing Younger's motion to suppress her statements from the interview, the trial court parsed the interrogation into several segments. The court determined that her initial statement that she was not waiving her rights but she would talk to the police did not create a reasonable understanding that she was invoking her right to counsel. Her statements following that were admissible.

The subject of a request for counsel next came up when Younger told Perry she needed a lawyer to make sure her "rights aren't bein' trampled on." The court held this was a clear invocation of the right to counsel and the interrogation had to cease at that time.

Younger then asked for water and cigarettes, and she went on to make unsolicited comments about her life being in danger. After she was informed that a public defender was not immediately available, she said she wanted to make a statement without an attorney being present. Perry asked her again if she wanted to speak without an attorney, and she said yes. The trial court held that this constituted an unsolicited waiver of her right to counsel and she had reinitiated the interrogation; her subsequent statements were therefore admissible.

The trial court than examined six specific indicators of whether Younger knowingly and intelligently waived her previously asserted right to counsel and whether her statements were voluntary. The court made these findings:

"1.     Younger appeared lucid and alert during all phases of her interview. While she stated she needed an insulin injection, it does not appear that she was adversely affected by the fact it took a while to supply her with the injection.

"2.     Though the interview lasted an appreciable amount of time, Younger did not appear tired, and did not complain that she was fatigued. She was, with reasonable promptness, given access to water and restroom facilities. Her biggest concern was

32

satisfying her cigarette habit, and it appeared Perry made every reasonable effort to allow her to smoke when she desired to do so.

"3.      Younger did not request to communicate with the outside world. In fact when given the opportunity to contact an attorney she knew she declined, stating it would threaten her safety.

"4.      Younger is 56 years of age. She appears to be of average or above average intellect.

"5.      Perry was fair in conducting the interview. He did not raise his voice or behave in a threatening manner.

"6.      Younger is fluent in the English language.

"This list is inclusive and not exhaustive. In this case the court finds that a major circumstance included in the totality of circumstances is Younger's obvious desire to talk, not only to police, but also to a prosecutor. It is clear from her interview and her conversation with Fowler that she believed telling her story would aid her, her husband, family and friends and perhaps totally absolve some of them. It is also clear that to her, time and secrecy were of the essence. If an attorney could not be procured quickly, it was her desire, or even her demand to proceed without an attorney.

"The court finds that subsequent to her request for an attorney she initiated and desired a further interview with Perry and the prosecutor without an attorney present. The court further finds that her post-request waiver of her right to counsel was voluntary under the totality of the circumstances."

The court's findings relating to Younger's capacity to understand her rights and voluntarily waive them are well supported by substantial competent evidence. Any suggestion that she was delusional based on the implausibility of her account of the background to the crimes and how the murders took place relates to the content of her statements, not to her capacity to understand the proceedings and her rights. A review of

33

the record in its entirety shows she was fully aware of what was going on and who frequently tried to take control of how the interview was conducted. There was no indication that the delay in taking her insulin, or any other factor, led her to be inarticulate, unfocused, or unable to understand what she was being told or how she was responding to comments and questions.

More complicated is the question of whether and when she invoked her *Miranda* right to counsel and whether and when she reinitiated the interview.

Invocation of the *Miranda* right to counsel requires at least some kind of statement that can reasonably be construed to express a desire for the assistance of an attorney. But if a suspect makes a reference to an attorney that is ambiguous or equivocal so that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, the United States Supreme Court does not require the cessation of questioning. *Davis v. United States*, 512 U.S. 452, 459, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994). Thus, an accused's remark that "'[m]aybe I should talk to a lawyer'" is not deemed a request for counsel that compels investigators to stop questioning. *Davis*, 512 U.S. at 462.

During the interview, Younger said she wanted to tell her story but she wanted an attorney present to protect her rights. Officer Perry suggested to her that an attorney would not want her to talk, and she replied that she did not have to listen to the attorney. This court has held that reminding an accused that an attorney might intervene to stop him or her from speaking with investigators is not proof of coercion and does not constitute an impermissible extension of the interview:

> "[T]he statement that an attorney would advise him not to talk with the KBI may have
> been made with the intent to obtain a confession from defendant, but logic would dictate
> an opposite result. The statement, on its face, is not so coercive as to render the waiver

and confession involuntary. There is substantial, competent evidence to support the trial court's finding that the statement was not so coercive that the defendant's will was overcome. Based on the content and surrounding circumstances, there is also competent evidence to hold the statement was not likely to elicit an incriminating statement if defendant didn't want to make one and was not the 'functional equivalent' of direct questioning after the assertion of the right to the presence of counsel, in violation of *Miranda* and *Innis*." *State v. Newfield*, 229 Kan. 347, 359-60, 623 P.2d 1349 (1981).

Here, Younger clearly wanted to tell the police her version of the events. She repeatedly said she wanted to talk; she even showed impatience at delays in the interview when she outright asked whether they even wanted to hear what she had to say. There is little indication of coercive conduct by the police. Often, the interviewing officials said nothing more than "okay" when she said she wanted to proceed with the interview. In conformity with *Newfield*, advising Younger that an attorney would probably tell her not to talk operated more as a *protection* of her rights than a *violation* of her rights—the officer was letting her know that an attorney would probably advise her not to talk, which might have given her pause to reconsider whether she wanted to make any further statements.

The district court suppressed Younger's statements made after she explicitly said she wanted an attorney present on her behalf, along with the county prosecutor in the Arkansas county where she was detained.

Once an accused has expressed a desire to deal with police only through counsel, the accused may not be subject to further interrogation by the authorities until counsel has been made available, unless the accused initiates further communication, exchanges, or conversations with the police. *Edwards v. Arizona*, 451 U.S. 477, 485, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981). This requirement that interrogation cease is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Michigan v. Harvey*, 494 U.S. 344, 350, 110 S. Ct. 1176, 108 L. Ed. 2d 293 (1990).

35

Nothing in the course of the interview suggests "badgering" on the part of the investigators. To the contrary, it often appears it was Younger who was badgering the officers to continue the interview. Younger wanted the police to hear her version of what happened. She sat in the interview room and said, when no one else was in the room:

> "Come on, this is ridiculous. Either you want my information or you don't. Come on, you've had me in this room for over a fuckin' hour now. It's not like I'm gonna run away, goddam. Come on. . . . Come on. Come on. Come on, lemme have a cigarette. Fuck me."

When the detectives returned, Younger said: "Are you guys gonna talk to me anytime soon?"

Even after requesting counsel, an accused may change his or her mind and talk to police without counsel, if the accused initiated the change without interrogation or pressure from the police. See *State v. Straughter*, 261 Kan. 481, 490, 932 P.2d 387 (1997). A comment as simple as, "Well, what is going to happen to me now?" may suffice to reinitiate conversations with law enforcement even when the accused has requested counsel and interrogation has stopped. *Oregon v. Bradshaw*, 462 U.S. 1039, 1042, 103 S. Ct. 2830, 77 L. Ed. 2d 405 (1983).

When Younger announced that she wanted to tell the whole story and she was willing to do that with only the prosecuting attorney present and no counsel for herself, she reinitiated the interview. And she did so with a vengeance, detailing her personal history, describing the machinations of Frank Zaitchik and his henchmen, and relating the events after the murders as she and her comrades fled across multiple state lines. At no point did she assume any responsibility for the crimes or ascribe any criminal conduct to her friends beyond cleaning up the crime scene.

The police did not use coercive tactics to get Younger to talk or to extend the interview. They did not threaten to withhold her insulin unless she talked. They did not make statements indicating she would be better off telling the truth. The furthest they went was asking her why her friends were all telling a story vastly different from the one she was telling and asking her who was lying. She initially responded that she did not believe her friends would take responsibility for the crimes and the police must be making that up. Then she said her friends were probably afraid of Frank Zaitchik. She insisted that it was important for the police to hear her version of the events so they would understand that no one in her group had committed any crimes.

Considering the record as a whole and taking into account that the trial court suppressed a portion of her statements, we find no violation of Younger's *Miranda* rights requiring suppression of her other statements. She wanted to talk, she wanted the local prosecutor to hear her story, and she expressed her willingness to talk without an attorney present on her behalf.

C.     Younger's Statements to Fowler

During her interrogation, Younger asked for the opportunity to talk with Michael Fowler outside of the interview room. The prosecutor suggested to the detective with whom she was speaking that it would be a good idea to allow her to do that but to ask Fowler if he would be willing to wear a wire. Fowler consented, and, unbeknownst to Younger, the supposedly private conversation was recorded.

Younger argues that her statements to Fowler should have been suppressed.

The police did not coerce Younger or even suggest to her that she should speak with Fowler. It was Younger who broached the subject of talking with him. She

37

explained she wanted to talk with him "outside" the interview room and volunteered they could both be handcuffed during the conversation. Fowler was generally silent during the meeting and did not ask questions. When Younger spoke with him, she told him to blame everything on Fred Viney, a carnival worker with whom Younger did not get along well. The narrative that she wanted Fowler to adopt was that Viney was a hit man, hired by Frank Zaitchik, who killed the Carpenters and who threatened to kill Younger and Fowler if they did not cooperate with him.

Caselaw from other jurisdictions tells us that the fact that a defendant is in custody and does not know his or her conversations are being recorded does not render the conversations involuntary or the products of custodial interrogations.

In *Williams v. Nelson*, 457 F.2d 376 (9th Cir. 1972), a conversation between the defendant and a codefendant was made by means of a concealed microphone without either of them being aware they were being recorded. The court held that the recording was not the product of police coercion because "[t]rickery does not constitute coercion." 457 F.2d at 377. Statements are not considered to be coerced or involuntary as violative of *Miranda* merely because the speakers are unaware that their statements are being recorded. See, e.g., *Illinois v. Perkins*, 496 U.S. 292, 298, 110 S. Ct. 2394, 110 L. Ed. 2d 243 (1990) (incarcerated suspect who made incriminating statements to undercover law enforcement officer posing as fellow inmate was not subjected to a custodial interrogation); *Siripongs v. Calderon*, 35 F.3d 1308, 1319-20 (9th Cir. 1994) (surreptitious recording of telephone call in jail by corrections officer standing nearby with a hidden recorder did not violate inmate's rights because his statements were not uttered in response to any interrogation); *Tower v. Ryan*, No. CIV. 09-1186-PHX-MHM, 2010 WL 3327596, at *9 (D. Ariz. 2010) (unpublished opinion) (recording of conversation between defendant and his parents without notice to him of the recording was noncoercive and did not violate the constitutional right to counsel), *report and*

*recommendation adopted* No. CV 09-1186-PHX-MHM, 2010 WL 3328260 (D. Ariz. 2010).

The United States Supreme Court has held that allowing an accused to speak with a spouse does not amount to interrogation:

"In deciding whether particular police conduct is interrogation, we must remember the purpose behind our decisions in *Miranda* and *Edwards* [*v. Arizona*, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981)]: preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment. The government actions in this case do not implicate this purpose in any way. Police departments need not adopt inflexible rules barring suspects from speaking with their spouses, nor must they ignore legitimate security concerns by allowing spouses to meet in private. In short, the officers in this case acted reasonably and lawfully by allowing Mrs. Mauro to speak with her husband." *Arizona v. Mauro*, 481 U.S. 520, 529-30, 107 S. Ct. 1931, 95 L. Ed. 2d 458 (1987).

Here, the conversation between Younger and Fowler was entirely voluntary and was carried out at her request. It was not an interrogation. The secret recording of the conversation was not unconstitutional.

*Suppression of Evidence from Searches of Younger's Backpack and Cell Phone*

Younger filed a motion to suppress evidence taken from her backpack after she gave written consent to a search. The trial court denied the motion, and she argues on appeal that the trial court erred.

For a consent to search to be valid, two conditions must be met: (1) there must be clear and positive testimony that consent was unequivocal, specific, and freely given; and (2) the consent must have been given without duress or coercion, express or implied.

*State v. Spagnola*, 295 Kan. 1098, 1107, 289 P.3d 68 (2012). The individual's mental state is a factor in determining the voluntariness of consent to search. *State v. Holmes*, 278 Kan. 603, 611, 102 P.3d 406 (2004).

The State has the burden of establishing the scope and voluntariness of the consent to search. Whether a consent is voluntary is an issue of fact that appellate courts review to determine if substantial competent evidence supports the trial court's findings. *State v. James*, 301 Kan. 898, 909, 349 P.3d 457 (2015). The trial court's decision that consent was voluntarily given will not be overturned on appeal unless it was clearly erroneous. *Holmes*, 278 Kan. at 611.

Younger asserts that the record shows that her consent to the searches of her backpack and phone was involuntarily given. She makes these assertions based on her need for insulin, the length of her interrogation, and supposed deception regarding her right to counsel. Although it is true that she did use insulin and the interrogation was lengthy, these facts do not dictate a finding that she was incapable of giving voluntary consent. The record suggests the contrary:  she was actually quite engaged in the interview process, and she attempted to steer the investigation toward the contents of her backpack and phone.

The record shows that, during a break in Younger's interview, Officer Perry spoke with Fowler's son-in-law Scott Spencer, who gave Perry permission to go to Spencer's apartment and seize property that Younger had left there. Spencer's wife, who was at the apartment, also gave the officers permission to retrieve Younger's property. The police removed the property and took it back to the station.

During her interview, Perry asked Younger, "[W]ould you have a problem if we went through [your property] and made sure there's nothin' illegal in it? You good with that?" She replied, "There shouldn't be anything in there but now can I have a cigarette

40

now please?" At around 9:00 a.m., they then went to the property storage room together. When they arrived at the storage room, Perry presented Younger with a form for consent to search her property. Before she signed it, Perry explained to her that she had the right to refuse consent to search her property and she had the right to stop the search at any time even if she earlier gave consent. Younger said, "'I have no problem with that,'" and signed the form. The form that Perry and Younger both signed read:

"I, Myrna Khan, D.O.B. 5-8-62, having been ask [*sic*] by Sgt. Perry and Det. Wear, who have identified themselves as police officers with the Van Buren Police Dept. for consent to search my Property Bags, located at V.B.P.D. [*sic*]. I have been advised by these officers of my constitutional rights to refuse or stop the search at any time. I have not been threatened or coerced in any way to give consent. I freely, voluntarily and intelligently give them and or their designated asistants [*sic*] the right to conduct this search."

Perry testified at the motion hearing that he was aware that Younger takes insulin and he did not observe any medical or competency symptoms suggesting she was not able to give valid consent. She did not appear to him to be delusional or in distress. Detective Jonathan Wear, who observed the interrogation, also did not observe any medical issues, or see any signs of mental distress or being tired.

Younger identified a red backpack as belonging to her, and Perry began to search it. As he did so, Younger told him that the gun that was used in the murders was in her bag. She watched him search the backpack and did not ask Perry to stop. He found a handgun in the backpack as well as her insulin, which he provided to her so she could inject herself. Perry did not require her to consent to the search as a condition for allowing her to take her insulin.

They returned to the interview room and were joined there by the county attorney, Marc McCune. Questioning continued for more than an hour, and then McCune asked

Younger whether he had her permission to look through her phone. She nodded yes. She did not appear to be under duress, and she had previously taken her insulin shot. Perry left the room to get the phone from the evidence cubicle, to which Younger responded, "Okay." Perry started to go through the phone, but, after about five minutes, Younger said she would like to have an attorney, and the interview ended. The messages that Perry saw on the phone were Facebook messages purporting to be between Frank Zaitchik and Michael Fowler.

Younger's attorney argued to the trial court that she did not provide valid consent for the search of her backpack or her phone. He asserted that the totality of the circumstances showed that Younger was tired, was late in receiving her insulin injection, and had not been provided with a lawyer. Counsel for the State responded that there was no sign of any coercion or mental confusion on Younger's part; she had freely given specific consent to the searches; and Younger did not assert a right to an attorney when she reinitiated the interview.

Following the suppression hearing, the trial judge ruled:

"With the testimony that was given, it's clear to the Court that under a totality of the circumstances that a free and voluntary waiver and agreement to the search of evidence was made; that there—there was no distress involved.

"Her—there was no testimony, nothing evidentiary that suggests that she was suffering from any kind of medical distress as a result of her—medical condition, nor did she ever hear or was there testimony that she was tired, worn out, fatigued. She did seem to be aware, and the statements were voluntary and cooperative. Therefore, the motion . . . on the suppression of evidence is denied."

Substantial competent evidence, found in both the testimony of the interrogating police and the record of the interview, supported the trial court's findings. Younger did

42

not rebut that evidence. In fact, she told the interviewers that they needed to get the murder weapon "to prove we didn't do anything." On appeal, she simply asks this court to draw inferences about her consent that the trial court declined to make. We decline her invitation to reweigh the evidence and conclude the trial court's decision was not clearly erroneous.

*Comments by Witnesses About Younger's Credibility*

A witness may not express an opinion on the credibility of another witness, and any such evidence must be disallowed. *State v. Elnicki*, 279 Kan. 47, 53-54, 105 P.3d 1222 (2005).

During the trial, two witnesses commented that Younger was a liar or was untrustworthy. Younger did not make contemporaneous objections, but she requested mistrials in breaks following the testimony. The court denied the motions and allowed the trial to proceed. On appeal, Younger contends that the commentary was not only improper, but it also was so prejudicial that this court must reverse her convictions.

Officer Kevin Dugan was a patrolman with the Van Buren, Arkansas, police department. He was describing to the jury why he arrested Younger when he returned to the Vista Hills Apartments. He explained that she had identified herself as "Tiffany Jones" when he first went to the apartments, but the file pictures of Tiffany Jones did not match Younger's appearance.

The prosecutor asked Dugan, "So now you got a concern about the name that was given to you by the defendant, right?" Dugan answered, "Yes, sir. At that time I knew we had a criminal violation. It was—she lied to us. Something was going on at that point in time." A little later, the prosecutor asked where he parked his patrol car, and Dugan

43

responded, "We drove in, came around. I actually parked right here, because I was coming to look for her, flat-out knowing that she had already lied to me about her name."

Younger's attorney did not object to either comment at the time, but a few minutes later, during a break, he moved for a mistrial. As he put it,

"Lie was being used. This officer—this witness has said it twice now. I mean, I could have jumped up and objected right at the time. But I—I didn't. I waited until—I waited a few minutes. But I think the appropriate thing for me to do is make a motion for a mistrial and let you rule on that or deal with it, Judge."

The prosecutor responded:

"Judge, as the Court's aware, the officer is from Arkansas. I'm not sure what the rules are in Arkansas. The State can clarify with the defendant—or with the witness about the—well, tell the witness not to use the word 'lie' and to go back and the name was given was not the name that came across on the report and that the name did not match, versus lie."

The judge denied the mistrial motion and suggested the prosecutor advise witnesses not to invade the province of the jury in determining the weight and credibility of testimony.

When the jurors returned to the courtroom, the judge instructed them:

"Ladies and gentlemen of the jury, we've come to this previously, but I want to restate. . . . I've told you previously, but I'm going to restate the fact that the determination of the weight and credit to give to any 'witness'[] statements or testimony during the—either during the investigation or during the trial is solely your responsibility. You'll be the ones to be deciding what value there is in the testimony provided."

44

The next day, Sparky Fox, a former coworker of Younger testified. The prosecutor asked him, "What would you say about [Younger's] demeanor as you're working with her at the carnival?" Fox responded, "I really—she seemed like—to me like a person I couldn't trust." The prosecutor then said, "Okay. I don't want you to comment on anything to do with credibility. I want to ask [about] her demeanor, so how she interacted with you."

Again, Younger's attorney did not object at the time, but during a break a while later, he said,

> "Judge, during Sparky Fox, his testimony, he went—well, regarding when Ms. Domme asked about his demeanor, he kind of said he didn't think of her as being trustworthy. Again, he didn't call her a liar. But I want to point that out. At the time I didn't jump up and object. I'll probably be criticized later for not. But I didn't want to let it go.
>
> "I suppose I have to make another motion for mistrial. I don't know whether you want to instruct them again or leave it as it is. But again, I just can't think I can let it go."

The prosecutor responded that she had corrected the witness, and the judge denied Younger's motion.

Under *In re Care & Treatment of Sigler*, 310 Kan. 688, 707-08, 448 P.3d 368 (2019), we review the trial court's denial of Younger's motions for mistrial for abuse of discretion. An abuse of discretion occurs when: (1) no reasonable person would take the view adopted by the district court; (2) the ruling is based on an error of law; or (3) the exercise of discretion is based on an error of fact. *State v. Carr*, 314 Kan. 744, 773, 502 P.3d 511 (2022), *cert. denied* 143 S. Ct. 584 (2023).

There is little question that Officer Dugan violated the demand of *Elnicki* that "a witness may not express an opinion on the credibility of another witness."

*Elnicki*, 279 Kan. 47, Syl. ¶ 2. He said he arrested Younger because he knew she was lying to him about her name. This was, however, less a comment on her general credibility and more an explanation for why he took the action that he did. It would be quite apparent to the jury that Younger lied when she said her name was Tiffany Jones; the record had already established her name was Kimberley Younger, and various witnesses testified that she used other pseudonyms, such as Myrna Khan and Jenna Roberts. At least as far as her name was concerned, there was no real question about Younger's credibility: she lied.

The trial court nevertheless gave the jury a corrective instruction that it was the jury's job, not a witness', to determine credibility. We see nothing in Dugan's testimony that would have added to the doubts about Younger's credibility beyond the ones she had herself created.

When Sparky Fox commented that he found Younger to be someone he "couldn't trust," the prosecutor immediately corrected him by saying she did not want Fox to comment on Younger's credibility. Fox did not elaborate on his observation, and it was not brought up again.

The two comments on Younger's credibility occurred against the backdrop of eight days of testimony and arguments. Dugan's statements that Younger "lied" about her name were objectively accurate. He could have characterized the incident differently, as the trial judge noted, by simply saying that she gave a name that was different from her real name, but that is an insignificant difference. Fox's comment was minor and was immediately corrected by the prosecutor.

This is not a situation of a *Ward* "fundamental failure in the proceeding." Furthermore, there is no "reasonable probability that the error will or did affect the outcome of the trial in light of the entire record." See *State v. Ward*, 292 Kan. 541,

46

551, 569, 256 P.3d 801 (2011). In addition, both the trial court and the prosecutor mitigated any error by a short instruction to the jury and other curative action—correcting the witness. This mitigation further reduces any prejudicial effect the comments may have had. See *Ward*, 292 Kan. at 569-70.

The complained of comments had a de minimis effect on the jury in light of the record as a whole, and the trial court did not abuse its discretion in denying the motions for new trial. See *State v. Alfaro-Valleda*, 314 Kan. 526, 549-50, 502 P.3d 66 (2022) (trial error of minimal effect in light of entire evidentiary production is not grounds for reversal).

*Refusal to Sequester State's Witness*

In the course of a hearing on pretrial motions, the State requested that Senior Special Agent Brian Carroll of the Kansas Bureau of Investigation be allowed to remain in the courtroom as an exception to the general sequestration of witnesses. The prosecutor noted that Carroll had reviewed most reports on the case, had gathered every piece of physical evidence from Arkansas, and had assisted the Great Bend Police Department's investigation. Carroll would not be seated at the table with the prosecutor and would only be in front of the bar whenever he might take the stand.

Younger's attorney objected, specifically noting that Carroll's appearance every day would be observed by the jury. The objection did not set out exactly what the problem with that would be, only going so far as to say, "I don't know whether that makes credibility or not for him, but it shows his obvious interest in the case just because he's going to be there . . . ."

The trial judge granted the State's request and overruled the objection, holding: "[U]nder the circumstances, again the vast details involved in this, that it would be

47

appropriate for Inspector Carroll to have an opportunity to be in the courtroom and may be of some benefit. So I'm going to grant the State's request and overrule the objection."

Carroll eventually took the stand a total of six times. Younger complains on appeal about four of his appearances. On the second day of the jury trial, Carroll testified briefly. He identified himself as the "case agent" or "the lead investigator" on the case. His testimony amounted to only six pages of transcript, and Younger's attorney did not cross-examine him. His testimony was limited to describing how the structures and vehicles were located on Friday, July 13, 2018. None of his testimony related to contested facts.

On the next day, the State called him to testify again. He described photographing, documenting, and searching several backpacks and duffle bags found in Arkansas. He also described clothing and other personal items in the containers. In addition, he discussed finding a Casey's General Store receipt from Pratt, Kansas, from the morning of July 14.

Of special interest was the notebook containing handwritten text, captioned "The Plan." The Plan set out a general outline of how killings might be carried out, including distracting the targets, although it did not specifically address the Carpenters or the Barton County fairgrounds. Carroll testified about how he gathered samples of Younger's handwriting to compare them with what was written on "The Plan." He did not testify about whether he made any comparisons between her handwriting samples and "The Plan," and he did not suggest he was qualified to make such comparisons.

On the fourth day of trial, Carroll twice testified again. First, he testified that a Walmart service order had the name "Myrna Khan" at the top, and Myrna Khan was an alias that Younger had sometimes used. He also testified about the contents of some video recordings from surveillance cameras that showed the route of the pickup and trailer as they left the fairgrounds. He later testified about the collection and identification

of physical evidence, including biological sample swabs. He further testified about a calendar that documented the Carpenters' travels and business transactions and about Thomas Drake's phone subscriber information. Younger's attorney did not cross-examine Carroll following either of these appearances as a witness.

On appeal, Younger contends that Carroll's continuing presence in the courtroom suggested that the jury should give his testimony greater weight than that of other witnesses, prejudicing her defense.

A trial court's decision whether to sequester a witness lies within that court's discretion. Furthermore, the trial court has discretion to permit certain witnesses to remain in the courtroom even if a sequestration order is in place. Allowing a testifying law enforcement officer to sit at the prosecution table is also subject to the trial court's discretion, although the practice is discouraged. When reviewing a claim that the trial court abused its discretion, this court determines whether the action (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact. *State v. Sampson*, 297 Kan. 288, 292, 301 P.3d 276 (2013).

Allowing a witness for the prosecution to remain in the trial courtroom presents two dangers. The first is that the presence of the witness in close proximity to the prosecutor may unfairly enhance the witness' credibility. See, e.g., *Sampson*, 297 Kan. at 296-97. The second is that witnesses may tailor their testimony to conform with earlier witnesses. 297 Kan. at 297.

In the present case, neither concern is a significant factor tending to show prejudice. Carroll's testimony was nothing more than descriptive: he explained what procedures were used to obtain and preserve evidence and how the evidence was identified. He did not dispute any claims by the defense, and he did not confirm or make any claims by the prosecution except that the evidence was what he collected. His

testimony served as foundation evidence for other witnesses, but he himself did not testify that anything associated Younger with any criminal activity.

In *Sampson*, this court cited favorably to *Knight v. State*, 746 So. 2d 423, 430 (Fla. 1998), *cert. denied* 528 U.S. 990 (1999). In *Knight*, the nonsequestered witness' testimony could be compared to trial transcripts and there was no potential that he or other witnesses could alter their testimony based on his presence in the courtroom. The Florida Supreme Court accordingly found no abuse of discretion in allowing the witness to testify. 746 So. 2d at 430.

Here, Younger does not question the veracity of Carroll's testimony. She also does not question that the identified items were retrieved from the locations that Carroll described. Carroll essentially described to the jurors what they could see with their own eyes:  pictures of boxes, a handwritten plan of action, a service receipt, and video footage.

It is difficult to ascertain exactly what impermissible bolstering of other witnesses Carroll provided. He simply identified items. Particularly lacking in Younger's argument is any indication that Carroll "tailored" his testimony based on what he heard other witnesses say. There is no hint that Carroll would have or could have testified differently if he had been sequestered. The danger of fabrication, inaccuracy, and collusion was minimal in the testimony that Carroll provided. Cf. *United States v. Jackson*, 60 F.3d 128, 133, 135 (2d Cir. 1995).

In *Sampson*, this court cited *Jackson*, which set out factors for a court to consider when deciding whether to sequester a witness. These factors include the number of attorneys prosecuting the case, the complexity of the case, how often the State plans to call the officer to testify, and whether the State could present the same testimony through other witnesses. *Sampson*, 297 Kan. at 297-98.

50

These factors all favor finding no abuse of discretion in the trial court's decision to allow Carroll to remain in the courtroom. Two attorneys were prosecuting the case and, at various times, two were defending. The case was excruciatingly complex, with dozens of witnesses, multiple and varied exhibits, and a theory of culpability involving identity theft, faked social media accounts, manipulation of others, and a trail of evidence stretching from Kansas across Missouri and into Arkansas. Placing the witnesses in a precise sequence must have been extraordinarily challenging. The State intended to call Carroll many times to provide the foundation for evidence and eventually called him six times. And, as the recipient and custodian of much of the evidence, Carroll was uniquely situated to identify exhibits and explain the chain of custody.

We conclude the trial court did not abuse its discretion in allowing Carroll to be present in the courtroom throughout the trial. He served the purpose of establishing the foundation for evidence in a remarkably complex case, but his testimony was limited to descriptions of the evidence and how it was obtained, as well as descriptions of handwritten texts, photographs, and video recordings. Nothing in the record suggests his testimony was inaccurate or misleading, and nothing suggests his credibility was ever in doubt.

*Cumulative Error*

Younger argues that even if this court should hold that individual errors were harmless, the cumulative effect was substantial prejudice that denied her right to a fair trial. Because we do not find multiple errors and we do not invoke harmless error analysis, cumulative error does not factor into our decision.

51

*Restitution*

K.S.A. 21-6604(b)(1) states that, in addition to other sentencing options, "the court shall order the defendant to pay restitution, which shall include, but not be limited to, damage or loss caused by the defendant's crime." K.S.A. 21-6604(b)(1).

At sentencing, the State submitted a request for restitution based on a claim from State Farm Insurance Company, restitution to the Crime Victims Compensation Board, expenses for the cost of extradition and evidence transport, and court costs. The order was then journalized. Younger asserts four claims of error in the calculation of restitution and the entry of written judgment.

Younger initially argues that the trial court lacked sufficient evidence to support an award of $30,239.93 to State Farm Insurance. The State submitted a letter from the State Farm Claims Department stating that it had paid claims on the trailer and the camper in the amounts of $9,197 and $21,042.93, and it was solely based on this letter that the court awarded restitution for the vehicles.

In property crimes, Kansas courts have consistently found that fair market value should be used as the typical standard for calculating loss or damage for purposes of restitution. The fair market value of property is the price that a willing seller and a willing buyer would agree upon in an arm's length-transaction. However, the restitution statute does not restrict a district court to award only the fair market value as restitution; restitution may include costs in addition to and other than fair market value. The appropriate amount is that which compensates the victim for the actual damage or loss caused by the defendant's crime. *State v. Hall*, 297 Kan. 709, 713-14, 304 P.3d 677 (2013).

Younger's attorney informed the court that it was unclear how the State arrived at its restitution amount. The letter from State Farm does not state how the amount of damages was reached. It also does not explain which claim was for the trailer and which for the pickup truck, or for the contents of either vehicle. Even more perplexing is that the "claimants" were Younger and her coconspirators. Nothing in the record informs who received compensation from State Farm, what became of the vehicles, or whether State Farm recovered some or all of its loss.

The trial court elected to impose restitution without addressing Younger's inquiry regarding how the amount was reached. The State had the burden of justifying its restitution request. See *State v. Dailey*, 314 Kan. 276, 278-79, 497 P.3d 1153 (2021). The State did little to satisfy its burden. Under *Dailey*, the State has forfeited its opportunity to prove the basis for the amount requested, and reversal of the restitution for State Farm's claims is warranted.

Younger also challenges the imposition of *any* civil restitution judgments without factual findings by a jury. This would include the $2626.50 awarded to the Crime Victims Compensation Board. As Younger notes in her brief, this court has recently taken up the question of both the federal and the state constitutional right to have a jury determine civil restitution awards. See *State v. Robison*, 314 Kan. 245, 249-50, 496 P.3d 892 (2021); *State v. Arnett*, 314 Kan. 183, 187-88, 496 P.3d 928 (2021). We have considered Younger's arguments urging this court to reject its holdings in *Robison* and *Arnett*, and we continue to find the reasoning behind those opinions sound. We therefore do not find error in the imposition of restitution to the Board.

Finally, Younger makes two claims of error with which the State agrees.

At the conclusion of sentencing, the district court judge pronounced that court costs, the DNA database fee, extradition costs, the lab fee, and the booking fee all were "ordered to be collected as part of the restitution amount."

Younger contends this part of the restitution sentence was illegal and must be corrected. She is correct, and the State agrees.

Restitution and court costs are two different things. Restitution is controlled by K.S.A. 21-6604, and court costs are subject to K.S.A. 22-3801 and K.S.A. 28-172a. Restitution is for damages to victims of crimes and may not include various other costs and fees. *State v. Gentry*, 310 Kan. 715, 738, 449 P.3d 429 (2019).

This portion of the restitution order was contrary to statute and therefore illegal. As an illegal sentence, it could be raised at any time. See K.S.A. 22-3504. The inclusion of the other costs is reversed.

Also, at sentencing, the judge announced: "The court also will order that the defendant make payments—consistent regular payments on restitution in an amount that will equal 25 percent of her monthly personal income." The journal entry of sentencing stated only the total restitution to be paid.

The judge's oral pronouncement at sentencing is controlling, not the journal entry. See, e.g., *State v. Edwards*, 309 Kan. 830, 835, 440 P.3d 557 (2019). The journal entry cannot undo the judge's pronounced restitution. Younger points out potential prejudice that she may suffer if the 25 percent limitation is not journalized: the full amount of the restitution could become due immediately under K.S.A. 21-6604(b)(1).

The State agrees that the journal entry is erroneous in omitting the conditions for paying restitution. Such an error is subject to correction as a clerical error through a nunc

pro tunc order. *Edwards*, 309 Kan. at 835-36. We find this relief to be appropriate and remand for issuing a nunc pro tunc order.

The convictions are affirmed, the restitution is reversed in part, inclusion of costs in restitution is reversed, and the case is remanded to the trial court to correct the judgment relating to restitution.

Affirmed in part, reversed in part, and remanded with directions.

\* \* \*

STEGALL, J., concurring: I join in the bulk of the majority's opinion. I write separately to note one point of divergence. The majority declines to address Younger's claim that her rights under section 10 of the Kansas Constitution Bill of Rights were violated when the court permitted Frank Zaitshik to testify via Zoom. Before us, Younger has argued that even if this remote testimony did not violate the Sixth Amendment to the United States Constitution, section 10 provides rights that are distinct from and broader than the Sixth Amendment and should have prevented the testimony. The majority finds Younger's section 10 claim to be unpreserved and declines to address it. *State v. Younger*, 320 Kan. ___, slip op. at 20-21. I disagree.

A review of the record shows that Younger did substantively raise the Kansas Constitution below. Her written objection to the Zoom testimony quotes section 10 of the Kansas Constitution Bill of Rights, which provides that "[i]n all prosecutions, the accused shall be allowed . . . to meet the witness face to face." She argued to the district court that permitting Zaitshik to testify remotely violated her right to meet him "face to face." The majority faults her for not making a more robust argument in objection, and so chooses to review only the part of her claim that arises under the Sixth Amendment. But I can see no

55

difference—from a preservation point of view—between Younger's Sixth Amendment objection and her section 10 objection. She objected "to the video conferencing testimony of Frank Zaitshik at the trial based upon the United States Constitution 5th, 6th, and 14th Amendments and Kansas Constitution Sec 10 right to confrontation of witness[es]." She then quoted each Constitution's relevant language. Indeed, she voiced her objection in equal terms as violations of both Constitutions. So it is curious the majority is willing to address one—at length—while finding the other unpreserved.

In my view, this apparent arbitrariness in applying preservation rules is unwise. These rules should not be treated like "a game of magic words or stilted technicalities." *T&J White, LLC v. Williams*, 375 So. 3d 1225, 1236 (Ala. 2022) (Parker, C.J., concurring in part and dissenting in part). We should not require a defendant to do more than simply raise an issue in the form of an objection to preserve it for review on appeal, particularly issues of constitutional import. See, e.g., *United States v. Flores-Martinez*, 677 F.3d 699, 710 n.6 (5th Cir. 2012) (no "'magic words'" required to preserve an issue); *United States v. Lopez*, 309 F.3d 966, 969 (6th Cir. 2002) ("'The preservation of a constitutional objection should not rest on magic words; it suffices that the district court be apprised of the objection and offered an opportunity to correct it.'"); *Corona v. State*, 64 So. 3d 1232, 1242 (Fla. 2011) (defendant not required to "intone special 'magic words'" to preserve a confrontation claim); *M.E. v. T.J.*, 380 N.C. 539, 559, 869 S.E.2d 624 (2022) (no "magic words" required to preserve an issue; rather, preservation rules are "a functional requirement of bringing the trial court's attention to the issue such that the court may rule on it"); *State v. Smith*, 513 P.3d 629, 645 (Utah 2022) ("'Whether a party has properly preserved an argument . . . cannot turn on the use of magic words or phrases.'").

The majority refuses to consider Younger's claim because though she objected on section 10 grounds, she did not make the explicit argument that section 10 provides broader and more robust protections than the Sixth Amendment. However, given that she objected on both section 10 and Sixth Amendment grounds, in my view this is sufficient

56

for us and the lower court to be alerted to the nature of her asserted error. Younger's objection and her appellate arguments "'need not be identical; the objection need only "give the district court the opportunity to address" the gravamen of the argument presented on appeal.'" *United States v. Rodriguez-Leos*, 953 F.3d 320, 324-25 (5th Cir. 2020). And in this instance, it really shouldn't matter whether Younger specifically asserted that section 10 confers broader protections than the Sixth Amendment. When considering an objection on two independent grounds, a reviewing court by necessity ought to evaluate whether those claims rise or fall together or if they require independent analysis. Requiring Younger to have raised the objection in such a specific way is pedantic and unjustifiably imposes requirements on defendants.

Thus, I would find Younger's section 10 claim properly preserved and before us for a decision. As such, we should—we must—examine whether her rights under section 10 were violated, which invariably includes examining the extent of the protections afforded by the Kansas Constitution's "face to face" guarantee.

The Sixth Amendment of the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The Kansas Constitution utilizes different language, providing: "In all prosecutions, the accused shall be allowed to . . . meet the witness face to face." Kan. Const. Bill of Rights § 10. Section 10—unlike its federal counterpart—plainly and explicitly requires a "face to face" confrontation. Section 10's unequivocal provision that a defendant is entitled to a *face-to-face* confrontation with a witness is not ambiguous. It grants a complete and unqualified right to confront witnesses face-to-face. See *State v. Riffe*, 308 Kan. 103, 113-14, 418 P.3d 1278 (2018) (Stegall, J., concurring) ("But the *meaning* of a law—a statute or a constitutional provision—cannot change until the text of that law changes. . . . '[O]ur constitution is deemed to mean what the words imply to a person's common understanding.'").

To be faithful to our constitutional text requires that we give effect to the actual words the Constitution employs. Often, though not always, this will entail a different mode of analysis than is used in interpreting and applying similar provisions in our federal Constitution. And in my view, it is constitutional error to permit a witness in a criminal trial to testify in a way that denies a defendant the face-to-face encounter that the drafters of the Kansas Constitution envisioned and explicitly guaranteed. See *People v. Fitzpatrick*, 158 Ill. 2d 360, 365-67, 633 N.E.2d 685 (1994) (concluding that the Illinois Constitution's confrontation clause which, like Kansas', provides the accused "'shall have the right . . . *to meet the witnesses face to face*'" unambiguously requires a "face to face" confrontation, which confers broader protections than the Sixth Amendment).

When this court eventually does reach the question of the scope of section 10's protections, it should not simply import Sixth Amendment caselaw that blithely abridges an individual's constitutional right for the sake of an amorphous "important public policy." See *Younger*, 320 Kan. at ___, slip op. at 15. Section 10 is clear, and "there is simply no room for interpretation with regard to 'the irreducible literal meaning'" of the text. *Maryland v. Craig*, 497 U.S. 836, 865, 110 S. Ct. 3157, 111 L. Ed. 2d 666 (1990) (Scalia, J., dissenting). Section 10 should thus be easily and affirmatively interpreted to ensure "that none of the many policy interests from time to time pursued by statutory law could overcome a defendant's right to face his or her accusers in court." 497 U.S. at 860-62 (Scalia, J., dissenting) (criticizing the majority's reliance on the "widespread belief" of the importance of the public policy of protecting child witnesses because "the Constitution is meant to protect against, rather than conform to, current 'widespread belief'"). When the time comes, I caution this court against applying any form of "'interest balancing'" where the constitutional text "simply does not permit it," as "[w]e are not free to conduct a cost-benefit analysis of clear and explicit constitutional guarantees, and then to adjust their meaning to comport with our findings." 497 U.S. at 870 (Scalia, J., dissenting).

Despite my disagreement with the majority's decision to decline to explore this paramount question, were we to conclude that admission of Zaitshik's remote testimony did violate Younger's section 10 right to a face-to-face confrontation, that error would still be subject to a constitutional harmless error analysis. See *State v. Williams*, 306 Kan. 175, 202, 392 P.3d 1267 (2017). And given the overwhelming evidence of Younger's guilt in this case, and the fact that Zaitshik was not a key part of the State's case, but merely a rebuttal witness, I am not convinced that there is a reasonable probability that his testimony had any effect on the verdict.

I concur in the judgment of the court.

WILSON, J., joins the foregoing concurring opinion.